IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No.

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

SLAWSON EXPLORATION COMPANY, INC.,

        Defendant.

## COMPLAINT

Plaintiff, the United States of America, by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action against Slawson Exploration Company, Inc. ("Slawson" or "Defendant") pursuant to Section 113(b) of the Clean Air Act (the "Act"), 42 U.S.C. § 7413(b).

2. The United States seeks injunctive relief and civil penalties for violations of the Act, the Federal Implementation Plan for Oil and Natural Gas Well Production Facilities, Fort Berthold Indian Reservation ("Fort Berthold FIP"), and North Dakota's federally-approved State Implementation Plan ("SIP") relating to emissions from oil and natural gas production facilities that are part of Slawson's operations in North Dakota.

3. Slawson owns and operates wells in the Williston Basin in North Dakota that

extract oil and natural gas from the Bakken, Three Forks, and/or Sanish Formations (collectively the "Bakken Pool"). Some of these wells are located on the Fort Berthold Indian Reservation. Others are located outside the exterior boundaries of the reservation.

4. These wells produce a mixture of oil, natural gas, and water.

5. This mixture is separated into its constituent parts near the well-head in a device known as a "separator" or "heater-treater." Following separation, the oil is transferred to atmospheric storage tanks (i.e. tanks kept near atmospheric pressure). As oil is transferred into these tanks, the pressure drops and vapors, which include volatile organic compounds ("VOC") and other air pollutants, are released or "flashed" into a gaseous state. Additional vapors are released from the oil due to liquid level changes and temperature fluctuations.

6. Slawson is required to capture all vapors from its storage tanks and route them through a closed-vent system to a control device meeting the requirements of the applicable rules. In the case of the Fort Berthold FIP, that generally means a control device capable of reducing VOC by at least 98%.

7. In the summer of 2014, EPA inspected numerous Slawson well pads in North Dakota and found venting of storage tank vapors directly to the atmosphere. EPA also found the use of "pit flares" at Slawson well pads on the Fort Berthold Indian Reservation to control storage tank emissions, under circumstances that are prohibited by the Fort Berthold FIP.

8. At many of Slawson's well pads on the Fort Berthold Indian Reservation, Slawson has violated requirements in the Fort Berthold FIP, including requirements relating to the control of vapors from storage tanks.

9. At many of Slawson's well pads in North Dakota outside the Fort Berthold Indian Reservation, Slawson has violated the requirements in the North Dakota SIP that: "No person

may cause or permit the emission of organic compounds gases and vapors, except from an emergency vapor blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by the department."

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), and 1355 (Fine, Penalty, or Forfeiture).

11. Venue is proper in this District under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations that are the basis of this Complaint occurred in this District and the well pads at issue are operated by Slawson in this District.

## NOTICES

12. For those well pads located outside the Fort Berthold Indian Reservation, notice has been given to Slawson and the appropriate air pollution control agency in the State of North Dakota as required by Section 113 of the Act, 42 U.S.C. § 7413.

## DEFENDANT

13. Slawson is a privately-held corporation engaged in oil and gas production and exploration. Slawson's Rocky Mountain exploration, development, and production offices are in Denver, Colorado.

14. Slawson owns and operates oil and natural gas production facilities in North Dakota that remove oil, natural gas, and other liquids from subsurface rock formations, separate the natural gas from the liquids, and then store the separated liquids in tanks until being transported by pipeline or picked up by truck for sale (produced oil) or disposal (produced

water).

15. Slawson is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

16. As set forth in Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1), the purpose of the Clean Air Act is to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population.

### A. National Ambient Air Quality Standards

17. Section 108 of the Act, 42 U.S.C. § 7408, directs EPA to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria based on "the latest scientific knowledge" about the effects of the pollutants on public health and the environment. These pollutants are known as "criteria pollutants."

18. Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to establish national ambient air quality standards ("national standards" or "NAAQS") for criteria pollutants. The primary standard must be set at a level "requisite to protect the public health" with an adequate margin of safety, and the secondary standard is intended to protect "the public welfare." According to Section 302(h) of the Act, 42 U.S.C. § 7602(h), public welfare effects are "effects on soils, water, crops, vegetation" and other environmental impacts including, but not limited to, effects on animals, wildlife, property, and "effects on economic values."

19. Ground-level ozone, commonly known as "smog," is one of six criteria pollutants for which EPA has promulgated national standards, due to its adverse effects on human health and the environment. Short-term exposures (1 to 3 hours) to ground-level ozone can cause acute health effects observed even at low concentrations, including temporary pulmonary

inflammation. Long-term exposure (months to years) may cause permanent damage to lung tissue. Children and adults who are active outdoors are particularly susceptible to the adverse effects of exposure to ozone. *See* 73 Fed. Reg. 16,436 (Mar. 27, 2008).

20. Pursuant to Section 110(a) of the Act, 42 U.S.C. § 7410(a), each state must adopt and submit to EPA for approval a plan that provides for the attainment, maintenance and enforcement of the NAAQS for each criteria pollutant in each air quality control region within the state. This plan is known as a state implementation plan or "SIP." Section 110(a)(2)(A) of the Act, 42 U.S.C. § 7410(a)(2)(A), requires that each SIP include enforceable emissions limitations to assure attainment of the NAAQS.

21. As required by Section 110(a) of the Act, 42 U.S.C. § 7410(a), North Dakota has periodically adopted regulations to provide for the attainment, maintenance and enforcement of the national standards for ground-level ozone. On June 1, 1992, North Dakota adopted the current version of North Dakota Air Pollution Control Rule ("NDAPCR") 33-15-07-02, and on June 30, 1992, the Governor of North Dakota submitted that version to EPA as a revision to the North Dakota SIP. 40 C.F.R. § 52.1837(c)(26)(i)(A).

22. After enforceable state emissions limitations are approved by EPA, these SIP provisions (or "SIP rules") are federally enforceable under Sections 113(a) and (b) of the Act, 42 U.S.C. § 7413(a) and (b).

**B.      North Dakota SIP**

23. Ozone is not emitted directly from sources of air pollution. Ozone is a photochemical oxidant, formed when certain chemicals in the ambient air react with oxygen in the presence of sunlight. These chemicals – VOC and nitrogen oxides (NOx) – are called "ozone precursors." Sources that emit ozone precursors are regulated to reduce ground-level ozone. *See*

62 Fed. Reg. 38,856 (July 18, 1997).

24. The requirements for organic compounds gas disposal in NDAPCR 33-15-07-02 are part of North Dakota's federally-enforceable SIP for the control of organic compounds emissions (i.e. VOC).

25. NDAPCR 33-15-07-02 sets forth VOC emissions reduction requirements for sources. Pursuant to 33-15-07-02.1, no person "may cause or permit the emission of organic compounds gases and vapors, except from an emergency blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by" the North Dakota Department of Health ("NDDH").[1]

26. Pursuant to NDAPCR 33-15-07-02.3, "[e]ach flare required under this section must be equipped and operated with an automatic ignitor or a continuous burning pilot."

27. These provisions became federally enforceable on October 20, 1995, the date EPA's rule approving these provisions as part of the North Dakota SIP became effective. *See* 60 Fed. Reg. 43,396 (Aug. 21, 1995).

    **C.**    **Fort Berthold FIP**

28. In 2013, EPA finalized a Federal Implementation Plan ("FIP") for the Fort Berthold Indian Reservation. The Fort Berthold FIP includes basic air quality regulations for the protection of public health and the environment. Among other things, the Fort Berthold FIP requires owners and operators of oil and natural gas production facilities to reduce VOC emissions from production and storage operations.

---

[1] NDDH may exempt "minor" sources from the requirements of this rule. The facilities at issue in this action are not minor and, in any event, Slawson has not sought or received from NDDH an exemption from the requirements of the rule.

29. As set forth in the Fort Berthold FIP:

   a. "Each owner or operator must operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere." 40 C.F.R. § 49.4164(a).

   b. Within 90 days of the first date of production, "each owner or operator must . . . [r]oute all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tank interconnected with the produced oil storage tanks through a closed-vent system to: (i) An operating system designed to recover and inject the natural gas emissions into a natural gas gathering pipeline system for sale or other beneficial purpose; or (ii) An enclosed combustor or utility flare capable of reducing the mass content of VOC . . . by at least 98.0 percent." 40 C.F.R. § 49.4164(d)(2).

   c. "Each owner or operator must equip all openings on each produced oil storage tank and produced water storage tank interconnected with produced oil storage tanks with a cover to ensure that all natural gas emissions are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare." 40 C.F.R. § 49.4165(a).

   d. "Each cover and all openings on the cover (e.g., access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank." 40 C.F.R. § 49.4165(a)(1).

   e. "Each cover opening shall be secured in a closed, sealed position (e.g., covered by a gasketed lid or cap) whenever material is in the unit on which the cover is

    installed except during those times when it is necessary to use an opening [to add or remove material, inspect or sample material, or inspect or repair equipment]." 40 C.F.R. § 49.4165(a)(2).

    f.  "Each thief hatch cover shall be weighted and properly seated." 40 C.F.R. § 49.4165(a)(3).

    g.  "Each PRV shall be set to release at a pressure that will ensure that natural gas emissions are routed through the closed-vent system to the vapor recovery system, the enclosed combustor, or the utility flare under normal operating conditions." 40 C.F.R. § 49.4165(a)(4).

    h.  "Each closed-vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by [40 C.F.R. § 49.4165(a)]." 40 C.F.R. § 49.4165(b)(1).

    i.  "All vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment must be maintained and operated properly at all times." 40 C.F.R. § 49.4165(b)(2).

    j.  "Each closed-vent system must be designed to operate with no detectable natural gas emissions." 40 C.F.R. § 49.4165(b)(3).

30.    The Fort Berthold FIP prohibits the use of pit flares to control storage tank vapors, except with prior EPA written approval if the uncontrolled potential VOC emissions from the aggregate of all storage tanks is less than, and reasonably expected to remain below, 20

tons in any consecutive 12-month period. *See* 40 C.F.R. §§ 49.4164(d)(2) and 49.4165(d)(2).

## FACTUAL BACKGROUND

### A. The Bakken

31. The Bakken, Three Forks, and Sanish Formations are rock formations within the Williston Basin that underlie large portions of northwestern North Dakota, northeastern Montana, southern Saskatchewan, and southwestern Manitoba. The Bakken Formation lies roughly two miles underground and covers approximately 200,000 square miles. The Three Forks and Sanish Formations are located beneath the Bakken Formation.

### B. Slawson Well Pads

32. The surface site from which a well is drilled is known as a "well pad." Slawson often drills multiple wells from the same well pad.

33. Slawson owns and/or operates approximately 171 well pads in North Dakota serving approximately 295 wells. A majority of these well pads are located on the Fort Berthold Indian Reservation. The remainder are located outside the exterior boundaries of the reservation.

34. The wells produce a mixture of oil, natural gas, and water. This mixture flows up the well under pressure to the well-head at the surface and then to a device called a separator (or sometimes a heater-treater).

35. The separator has a pressure setting to optimize production, typically between 15 and 55 pounds per square inch gauge ("psig").

36. The purpose of a separator is to separate the effluent from the well into its constituent parts: oil, natural gas, and water (also known as "produced water").

37. Once separated, the gas goes to a sales pipeline or is burned in a high-pressure flare. The produced water goes to a produced water storage tank. And the oil goes to a produced

oil storage tank. This case focuses on the oil stream.

38. The storage tanks are kept near atmospheric pressure, at a positive pressure of not more than 1 psig (16 oz/in$^2$), and hence are often referred to as atmospheric storage tanks.

39. When pressurized oil is transferred from a separator to an atmospheric storage tank, the pressure of the oil drops quickly. This causes some of the hydrocarbons in the oil, including VOC, HAP, and methane, to vaporize in a phenomenon known as "flashing." After flashing occurs, the oil continues to emit vapors due to liquid level changes and temperature fluctuations. These are known as "working" and "breathing" losses.

40. Slawson is required to capture and control the vapors from its storage tanks. Slawson does this by routing the vapors through a series of pipes or vent lines to a combustion device.

41. The term "vapor control system" is used herein to refer to the vent lines from a storage tank or group of connected storage tanks to a combustion device, and all connections, fittings, pressure relief devices (including thief hatches on the storage tanks), and any other appurtenance used to contain and collect storage tank vapors, and to transport or convey the vapors to a control device.

    **C.**    **Storage Tank Thief Hatches**

42. The tops of the storage tanks have openings called "thief hatches." Thief hatches are equipped with gaskets that are supposed to seal tight when closed.

43. Thief hatches serve two primary purposes. First, they provide access to the contents of a storage tank for taking samples and measuring the liquid level in the tank (known as "gauging"). Second, they provide a means of (a) relieving pressure from a storage tank to prevent over pressurization and (b) eliminating excessive vacuum.

oil storage tank. This case focuses on the oil stream.

38. The storage tanks are kept near atmospheric pressure, at a positive pressure of not more than 1 psig (16 oz/in$^2$), and hence are often referred to as atmospheric storage tanks.

39. When pressurized oil is transferred from a separator to an atmospheric storage tank, the pressure of the oil drops quickly. This causes some of the hydrocarbons in the oil, including VOC, HAP, and methane, to vaporize in a phenomenon known as "flashing." After flashing occurs, the oil continues to emit vapors due to liquid level changes and temperature fluctuations. These are known as "working" and "breathing" losses.

40. Slawson is required to capture and control the vapors from its storage tanks. Slawson does this by routing the vapors through a series of pipes or vent lines to a combustion device.

41. The term "vapor control system" is used herein to refer to the vent lines from a storage tank or group of connected storage tanks to a combustion device, and all connections, fittings, pressure relief devices (including thief hatches on the storage tanks), and any other appurtenance used to contain and collect storage tank vapors, and to transport or convey the vapors to a control device.

    **C.**    **Storage Tank Thief Hatches**

42. The tops of the storage tanks have openings called "thief hatches." Thief hatches are equipped with gaskets that are supposed to seal tight when closed.

43. Thief hatches serve two primary purposes. First, they provide access to the contents of a storage tank for taking samples and measuring the liquid level in the tank (known as "gauging"). Second, they provide a means of (a) relieving pressure from a storage tank to prevent over pressurization and (b) eliminating excessive vacuum.

44. To prevent over pressurization, thief hatches are designed to open (or vent) when the pressure inside the tank exceeds the pressure setting of the thief hatch.

45. Slawson uses "spring loaded" thief hatches. The pressure setting is determined by the stiffness of the pressure spring. Pressure springs range in stiffness from 2 ounces per square inch ("ounces") (meaning the thief hatch will begin to open or vent when pressure in the tank exceeds 2 ounces) to 32 ounces.

46. When the pressure inside the storage tank exceeds the pressure setting of the thief hatch, the spring begins to compress, causing the thief hatch to open. When the pressure drops below the pressure setting, the spring expands causing the thief hatch to close.

47. At least until January 2015, many of the storage tanks operated by Slawson had thief hatches with 4 ounce pressure settings. That meant that the thief hatches would begin to open or vent any time the pressure inside the tanks exceeded 4 ounces.

**D.  EPA Inspections and Follow-Up Investigation**

48. In June and July of 2014, EPA conducted announced inspections of 30 Slawson well pads located on the Fort Berthold Indian Reservation. Using an optical gas-imaging infrared camera ("IR camera"), EPA observed that storage tanks at many well pads were directly emitting vapors to the atmosphere from thief hatches on the tanks. In many cases, EPA's IR camera observations were corroborated with a Photo-Ionization Detector ("PID"), which detects non-methane, non-ethane VOC.

49. During the June/July 2014 inspections, EPA observed other signs of active emissions at many of the tanks, such as hearing hissing, smelling hydrocarbons, and seeing wave refractions. EPA also observed hydrocarbon stains around thief hatches, an indication that vapors had been emitted from the tanks.

50. In addition to seeing direct venting of storage tank vapors to the atmosphere from thief hatches, EPA found that Slawson was using "pit flares" to control storage tank vapors at numerous well pads on the Fort Berthold Indian Reservation, under circumstances not permitted by the Fort Berthold FIP.

51. During the June/July 2014 inspections, EPA observed other violations of the Fort Berthold FIP, including open thief hatches and a leaking closed-vent system.

52. In August of 2014, EPA and the North Dakota Department of Health ("NDDH") inspected 11 Slawson well pads located in North Dakota outside the Fort Berthold Indian Reservation. Using an IR camera, EPA observed that storage tanks at many of the 11 well pads were directly emitting vapors to the atmosphere from thief hatches on the tanks. EPA also observed other signs of active emissions, such as hearing hissing, smelling hydrocarbons, and seeing wave refractions. EPA also observed hydrocarbon stains around thief hatches, an indication that vapors had been emitted from the tanks.

53. During the August 2014 inspections, EPA observed other violations of the North Dakota SIP, including a leaking closed-vent system and unlit combustion devices.

54. Further investigation indicated that Slawson had failed to conduct a formal engineering analysis to ensure that its vapor control systems were adequately designed to route all storage tank vapors to emissions control devices. In many cases, the storage tanks were connected to systems that were not adequate to route all vapors from the storage tanks to emissions controls, forcing vapors to be emitted directly to the atmosphere from thief hatches on the tanks.

55. A common problem at many of Slawson's well pads was that the pressure within the storage tanks – generated by flashing and working and breathing losses – exceeded the

pressure settings of the thief hatches. This resulted in storage tank vapors being directly emitted to the atmosphere via thief hatches on the tanks.

56. According to Slawson, following the EPA and NDDH inspections in 2014, Slawson replaced many of the thief hatch pressure springs with stiffer springs. Specifically, Slawson has represented that, beginning in January 2015, it replaced many of the original thief hatch pressure springs with pressure springs having a 16-ounce pressure setting.

## **GENERAL ALLEGATIONS**

57. At all times relevant to the Complaint, Slawson conducted oil and natural gas production operations in the Bakken Pool in North Dakota.

58. Slawson owns and/or operates the well pads listed in Appendices A and B.

59. Each of the well pads in Appendix A is located on the Fort Berthold Indian Reservation.

60. Each of the well pads in Appendix A is an "oil and natural gas production facility" within the meaning of the Fort Berthold FIP, 40 C.F.R. § 49.4163(11).

61. Each of the well pads in Appendix A produces oil and/or natural gas from the Bakken, Three Forks, or Sanish Formations in North Dakota (i.e., the Bakken Pool).

62. Each of the well pads in Appendix A has one or more oil and natural gas wells that was completed or recompleted after August 12, 2007.

63. As oil and natural gas production facilities located on the Fort Berthold Indian Reservation, with one or more wells completed or recompleted after August 12, 2007, and producing from the Bakken Pool, the well pads listed in Appendix A are subject to the requirements of the Fort Berthold FIP.

64. Each of the well pads in Appendix B is located in North Dakota outside the

exterior boundaries of the Fort Berthold Indian Reservation.

65. Each of the well pads listed in Appendix B is subject to the requirements of the North Dakota SIP at NDAPR 33-15-07-02.

## **FIRST CLAIM FOR RELIEF**
(Violations of Fort Berthold FIP Related to Vapor Control Systems)

66. Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

67. On information and belief, Slawson constructed one or more of the well pads identified in Appendix A without first performing a formal engineering design analysis to determine if the vapor control system(s) would route all storage tank vapors to an emissions control device.

68. When the capacity of a vapor control system is exceeded, vapors from the associated storage tanks, including VOC, HAP, and methane, are emitted directly to the atmosphere through thief hatches.

69. These vapors can also be illegally emitted if the vapor control system is not properly operated and maintained. For example, vapors can be emitted if the thief hatch gasket is worn or otherwise not properly maintained or if the thief hatch is not properly sealed.

70. At least through January 2015, the vapor control systems at one or more of the well pads identified in Appendix A did not convey all of the vapors from the storage tanks to control devices. Some or all of the vapors were, instead, emitted directly to the atmosphere through thief hatches and/or other points on the vapor control systems.

71. At one or more of the well pads identified in Appendix A, Slawson has violated one or more of the following requirements of the Fort Berthold FIP:

    a. All liquid and gas collection, storage, processing, and handling operations, regardless of size, must be operated and maintained to minimize leakage of natural gas emissions

to the atmosphere [40 C.F.R. § 49.4164(a)];

  b. Within 90 days of the first date of production, all standing, working, breathing, and flashing losses from produced oil storage tanks and any produced water storage tanks interconnected with produced oil storage tanks must be routed through a closed-vent system to an operating system designed to recover and inject the natural gas emissions into a natural gas gathering pipeline system for sale or other beneficial use or an enclosed combustor or utility flare capable of reducing the mass content of VOC by at least 98.0 percent [40 C.F.R. § 49.4164(d)(2)];

  c. All openings on produced oil storage tanks and any produced water storage tanks interconnected with produced oil storage tanks must be equipped with a cover to ensure that all natural gas emissions are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare [40 C.F.R. § 49.4165(a)];

  d. All covers and openings on covers (e.g. access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) must form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank [40 C.F.R. § 49.4165(a)(1)];

  e. All cover openings must be secured in a closed, sealed position (e.g., covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except during those times when it is necessary to use an opening to add or remove material, inspect or sample material, or inspect or repair equipment [40 C.F.R. § 49.4165(a)(2)];

  f. All thief hatch covers must be weighted and properly seated [40 C.F.R. § 49.4165(a)(3)];

  g. All PRVs must be set to release at a pressure that will ensure that natural gas

emissions are routed through the closed-vent system to a control device under normal operating conditions [40 C.F.R. § 49.4165(a)(4)];

h. Each closed-vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by the FIP [40 C.F.R. § 49.4165(b)(1)];

i. All vent lines, connections, fittings, valves, relief valves, and any other appurtenance employed to contain and collect natural gas, vapor, and fumes must be maintained and operated properly at all times [40 C.F.R. § 49.4165(b)(2)]; and

j. Each closed-vent system must be designed to operate with no detectable natural gas emissions [40 C.F.R. § 49.4165(b)(3)].

72. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Slawson is liable for injunctive relief and civil penalties for each violation.

**SECOND CLAIM FOR RELIEF**
(Violations of Fort Berthold FIP Related to Impermissible Use of Pit Flares)

73. Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

74. The Fort Berthold FIP requires each owner and operator, within 90 days of the first date of production, to "route all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tank interconnected with the produced oil storage tanks through a closed-vent system to . . . [a]n enclosed combustor or utility flare capable of reducing the mass content of VOC in the natural gas emissions vented to the device by at least 98.0 percent or greater." 40 C.F.R. § 49.4164(d)(2)(ii).

75. Under the Fort Berthold FIP, pit flares are not considered "enclosed combustors" or "utility flares."

76. Moreover, pit flares are not capable of reducing the mass content of VOC by at

least 98.0 percent.

77. The requirement to use an enclosed combustor or utility flare to reduce VOC by at least 98.0 percent, referenced in paragraph 74 above, does not apply "[i]f the uncontrolled potential to emit VOCs from the aggregate of all produced oil storage tanks and produced water storage tanks interconnected with produced oil storage tanks at an oil and natural gas production facility is less than, and reasonably expected to remain below, 20 tons in any consecutive 12-month period, then, upon prior written approval by the EPA the owner or operator may use a pit flare, an enclosed combustor or a utility flare that is capable of reducing the mass content of VOC in the natural gas emissions from the storage tanks vented to the device by only 90.0 percent." 40 C.F.R. § 49.4164(d)(2)(iii).

78. Slawson did not obtain prior written approval from EPA to use pit flares to control storage tank emissions at any of the well pads listed in Appendix A.

79. At one or more of the well pads listed in Appendix A that had uncontrolled potential to emit VOC from the produced oil storage tanks and any produced water storage tanks interconnected with the produced oil storage tanks of more than 20 tons in any consecutive 12-month period, Slawson used pit flares, after the deadline in the Fort Berthold FIP, to control storage tank emissions, in violation of the Fort Berthold FIP. 40 CFR § 49.4164(d)(2).

80. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Slawson is liable for injunctive relief and civil penalties for each violation.

### THIRD CLAIM FOR RELIEF
(Violation of North Dakota SIP Related to Vapor Control Systems)

81. Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

82. On information and belief, Slawson constructed one or more of the well pads identified in Appendix B without first performing a formal engineering design analysis to

determine if the vapor control system(s) would route all storage tank vapors to an emissions control device.

83. When the capacity of a vapor control system is exceeded, vapors from storage tanks, including VOC, HAP, and methane, are emitted directly to the atmosphere through thief hatches.

84. These vapors can also be illegally emitted if the vapor capture system is not properly operated and maintained. For example, vapors can be emitted if the thief hatch gasket is worn or otherwise not properly maintained and if the thief hatch is not properly sealed.

85. At least through January 2015, the vapor capture systems at one or more of the well pads identified in Appendix B did not convey all of the vapors from the storage tanks to control devices. Some or all of the vapors were, instead, emitted directly to the atmosphere through thief hatches and/or other points on the vapor capture systems.

86. At one or more of the well pads identified in Appendix B, Slawson has violated the requirement of the North Dakota SIP, NDAPR 33-15-07-02.1, that "[n]o person may cause or permit the emission of organic compounds gases and vapors, except from an emergency vapor blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by the department."

87. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Slawson is liable for injunctive relief and civil penalties for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, based on the allegations contained in paragraphs 1 through 87 above, the United States requests that this Court:

A. Permanently enjoin Defendant from further violating the Act, the Fort Berthold

FIP, and the North Dakota SIP;

      B.     Order Defendant to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by violations of the Act, the Fort Berthold FIP, and the North Dakota SIP;

      C.     Assess a civil penalty against Defendant for each violation of the applicable provisions of the Act, the Fort Berthold FIP, and the North Dakota SIP;

      D.     Award Plaintiff its costs of this action; and

      E.     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

MARK C. ELMER
Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
(303) 844-1352 (PHONE)
(303) 844-1350 (FAX)
Mark.Elmer@usdoj.gov