UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION


Case No. 1:16-CV-00413-DLH-CSM


UNITED STATES OF AMERICA,

       *Plaintiff*,

   v.

SLAWSON EXPLORATION COMPANY, INC.,

       *Defendant*.

---

## UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO ENTER PROPOSED CONSENT DECREE

---

## TABLE OF CONTENTS

I.   BACKGROUND ................................................................................................ 2

   A. Factual Background ................................................................................... 2

      1.   Slawson, the Well Pads, and the Emissions........................................ 2

      2.   EPA Inspections and Assessment of Slawson Data.............................. 3

   B. Regulatory Background .............................................................................. 5

      1.   Fort Berthold FIP ............................................................................. 5

      2.   North Dakota SIP.............................................................................. 6

      1.   Injunctive Relief.............................................................................. 8

      2.   Mitigation Projects........................................................................... 9

      3.   Civil Penalty.................................................................................... 10

      4.   Effect of Settlement ......................................................................... 10

II.  ARGUMENT ................................................................................................... 11

   A. Standard for Judicial Review of a Consent Decree .................................... 11

   B. The Decree is Fair, Reasonable, Adequate, and Consistent with the Goals of
      the Act..................................................................................................... 14

      1.   The Decree is Fair............................................................................ 14

      2.   The Decree is Reasonable, Adequate, and Consistent with the Goals of
           the Act......................................................................................... 16

   C. Neither Comment Provides a Basis for Rejecting the Consent Decree ...................... 18

      1.   Ms. Ventsch's Comment.................................................................... 18

      2.   The Associations' Comment............................................................... 19

CONCLUSION...................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Aro Corp. v. Allied Witan Co.*,
   531 F.2d 1368 ................................................................................................. 11

*Donovan v. Robbins*,
   752 F.2d 1170 (7th Cir. 1984) ........................................................................ 11

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
   768 F.2d 884 (7th Cir. 1985) ............................................................... 1, 15, 22

*F.T.C. v. Guignon*,
   390 F.2d 323 (8th Cir. 1968) ........................................................................ 13

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ....................................................................................... 24

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ........................................................................ 27

*Halderman v. Pennhurst State Sch. & Hosp.*,
   901 F.2d 311 (3d Cir. 1993) ......................................................................... 13

*In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*,
   712 F. Supp. 1019 (D. Mass. 1989) .............................................................. 12

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
   478 U.S. 501 (1986) ....................................................................................... 24

*Metro Hous. Dev. Corp. v. Vill. of Arlington Heights*,
   616 F.2d 1006 (7th Cir. 1980) ......................................................... 24, 27, 33

*Ne. Iowa Citizens for Clean Water v. Agriprocessors, Inc.*,
   469 F. Supp. 2d 666 (N.D. Iowa 2006) ......................................................... 14

*Officers for Justice v. Civil Service Comm'n of City and Cty. Of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ........................................................................ 12

*Sam Fox Publ'g Co. v. United States*,
   366 U.S. 683 (1961) ....................................................................................... 12

*Swift & Co. v. United States*,
   276 U.S. 311 (1928) ....................................................................................... 13

*United States Pub. Interest Research Grp. v. Atl. Salmon of Maine,*
339 F.3d 23 (1st Cir. 2003) ................................................................ 24

*United States v. Akzo Coatings of America, Inc.,*
949 F.2d 1409 (6th Cir. 1991)........................................................ 11, 12

*United States v. Armour & Co.,*
402 U.S. 673 (1971) ............................................................... 1, 22, 23

*United States v. Associated Milk Producers, Inc.,*
534 F.2d 113 (8th Cir. 1976)................................................................ 13

*United States v. BP Amoco Oil PLC,*
277 F.3d 1012 (8th Cir. 2002)............................................................. 14

*United States v. Cannons Eng'g Corp.,*
899 F.2d 79 (1st Cir. 1990) ....................................................... 12, 14, 16

*United States v. Cinergy Corp.,*
582 F. Supp. 2d 1055 (S.D. Ind. 2008) ................................................ 24

*United States v. City of Jackson, Miss.,*
519 F.2d 1147 (5th Cir. 1975)............................................................. 13

*United States v. D.C.,*
933 F. Supp. 42 (D.C.C. 1996)............................................................ 14

*United States v. Hercules, Inc.,*
961 F.2d 796 (8th Cir. 1992)........................................................ 12, 13

*United States v. Metro. St. Louis Sewer District (MSD),*
952 F.2d 1040 (8th Cir. 1992)............................................................. 12

*United States v. State of Colo.,*
937 F.2d 505 (10th Cir. 1991)............................................................. 12

*United States v. Telluride Co.,*
849 F. Supp. 1400 (D. Colo. 1994) ..................................................... 14

*United States v. Union Elec. Co.,*
132 F.3d 422 (8th Cir. 1997)............................................................... 12

*United States v. Union Elec. Co.,*
934 F. Supp. 324 (E.D. Mo. 1996)...................................................... 16

**Statutes**

42 U.S.C. § 7401(b)(1) ................................................................................. 18

42 U.S.C. § 7410(a)(1) ................................................................................... 6

42 U.S.C. § 7410(a)(2)(A) .............................................................................. 6

42 U.S.C. § 7414 ............................................................................................. 4

42 U.S.C. §§ 7413(a) ...................................................................................... 6

**Regulations**

28 C.F.R. § 50.7 ....................................................................................... 1, 11

40 C.F.R. § 49.4164(a) .............................................................................. 5, 23

40 C.F.R. § 49.4164(d)(2) ..................................................................... 5, 6, 23

40 C.F.R. § 49.4165(a) ................................................................................ 5, 6

40 C.F.R. § 49.4165(a)(1) ............................................................................... 5

40 C.F.R. § 49.4165(a)(2) ............................................................................... 5

40 C.F.R. § 49.4165(a)(3) ............................................................................... 5

40 C.F.R. § 49.4165(a)(4) ............................................................................... 6

40 C.F.R. § 49.4165(b)(1) ............................................................................... 6

40 C.F.R. § 49.4165(b)(2) ............................................................................... 6

40 C.F.R. § 49.4165(b)(3) ............................................................................... 6

40 C.F.R. § 60.2 ............................................................................................. 35

40 C.F.R. Part 60 ........................................................................................... 35

62 Fed. Reg. 38856 (July 18, 1997) ................................................................ 7

**Other Authorities**

60 Fed. Reg. 43396 (Aug. 21, 1995) .......................................................... 7, 20

62 Fed. Reg. 38856 (July 18, 1997) ................................................................ 7

78 Fed. Reg. 9823 (Feb. 12, 2013) .................................................................. 6

81 Fed. Reg. 88270 (Dec. 7, 2016) ........................................................................... 1, 11

NDAPCR 33-15-07-02 ............................................................................................ 7, 23

The United States submits this memorandum in support of its motion to enter the proposed Consent Decree lodged on December 1, 2016 (Dkt. No. 4) (the "Consent Decree" or "Decree"). The Decree would resolve the claims of the United States against Slawson Exploration Company, Inc. ("Slawson") for its alleged violations of the Clean Air Act (the "Act") at well pads owned and operated by Slawson in North Dakota.

The Decree should be entered because it satisfies the standard for entry: it is fair, adequate, and reasonable, and consistent with the goals of the Act. The agreement was reached after careful and informed assessment of the merits, costs, risks, and delays that litigation would entail. The settlement would substantially reduce emissions of volatile organic compounds ("VOC") and other air pollutants and commits Slawson to pay a $2.1 million civil penalty and to perform an estimated $2 million in environmental mitigation projects. Slawson has consented to entry of the Decree without further notice. *See* Decree ¶ 89.

The alternative to this settlement is litigation that would involve complex scientific and technical issues, would delay expected environmental benefits, and would be resource-intensive for the litigants and the Court. The Decree should be entered as a final judgment consistent with the strong public policy in favor of voluntary settlements, which conserve limited law enforcement and judicial resources. Through the Decree, "each side," in the words of one court, "gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).

In accordance with 28 C.F.R. § 50.7, the United States sought public comment on the Decree by publishing a notice in the Federal Register. *See* 81 Fed. Reg. 88270 (Dec. 7, 2016).

1

Two comments were received. As discussed below, these comments do not provide a basis for the United States to withdraw its consent or for the Court to disapprove the settlement. The United States, therefore, requests that the motion to enter be granted and that the Decree be entered as an order of the Court.

## I.   BACKGROUND

**A.  Factual Background**

### 1.  Slawson, the Well Pads, and the Emissions

Slawson is a privately-held corporation engaged in oil and gas exploration and production. Slawson is a partial owner and the exclusive operator of approximately 170 well pads in North Dakota, serving about 295 wells. Roughly 90 of the well pads are located on the Fort Berthold Indian Reservation ("FBIR"). The remainder are located on state land outside the exterior boundaries of the FBIR.

Slawson's wells produce a mixture of oil, gas, and water, which flows under pressure from the well-head to a device known as a separator (or sometimes a "heater-treater"). The separator separates the mixture into its constituent parts. The gas goes to a sales pipeline or high pressure flare. The oil goes to a produced oil storage tank. And the water goes to a produced water storage tank.

The storage tanks are kept near atmospheric pressure, at a positive pressure no greater than one pound per square inch. When pressurized oil from the separator is transferred into storage tanks, the pressure of the oil drops quickly. This causes some of the hydrocarbons in the oil, including VOC, methane, and various hazardous air pollutants ("HAP"), to vaporize in a phenomenon known as "flashing." After flashing, the oil continues to emit vapors due to liquid

2

level changes and temperature fluctuations. These vapors are known as "working" and "breathing" losses.

The tops of the storage tanks have openings called "thief hatches," which serve two purposes. First, they allow access to the contents of the tank for taking samples and measuring the level of liquids in the tank (known as "gauging"). Second, they provide a means of relieving pressure from the tank to prevent the tank from over pressurizing and rupturing in the event that operations cause a pressure buildup of gas in the tanks.

The storage tanks are connected to air pollution control devices commonly known as combustors or flares. The combustors burn tank vapors, including VOC, methane, and HAP, that result from flashing, working, and breathing losses. The control device, the vent lines from a storage tank or group of connected storage tanks to a control device, and all connections, fittings, relief valves (including thief hatches on the storage tanks), and any other appurtenance used to contain and collect storage tank vapors and route the vapors to the control device, are referred to as a "vapor control system."

> 2. **EPA Inspections and Assessment of Slawson Data**

In June of 2014, EPA inspected 18 well pads on the FBIR, seven of which were operated by Slawson. The inspectors observed, using an optical gas-imaging infra-red camera ("IR camera"), VOC emissions from thief hatches on storage tanks at 9 of the 18 well pads, including all seven of the well pads operated by Slawson. Based on these results, EPA conducted follow-up inspections of Slawson well pads on the FBIR in July 2014. In total, EPA inspected 29 well pads operated by Slawson on the FBIR and observed, using an IR camera, VOC emissions from thief hatches on storage tanks at 28 of the 29 well pads. In many cases, the inspectors' IR camera observations were corroborated by a Photo-Ionization Detector, which detects non-methane, non-

3

ethane VOC.

In addition, EPA inspectors found that Slawson was illegally using "pit flares" to control storage tank vapors at many well pads on the FBIR. The Fort Berthold Federal Implementation Plan ("Fort Berthold FIP") generally prohibits the use of pit flares to control storage tank vapors. With limited exceptions not applicable here, the Fort Berthold FIP requires operators to route storage tank vapors to a control device capable of reducing VOC by at least 98%. Pit flares are only capable of reducing VOC by 90%.

In August of 2014, EPA inspected 11 Slawson well pads located in North Dakota outside the FBIR. Using an IR camera, EPA inspectors observed emissions from thief hatches on storage tanks at 8 of the 11 well pads. At many of the tanks, EPA also observed other signs of active emissions, such as hissing, hydrocarbon odors, and visible wave refractions.

Slawson has represented that, after the inspections, it replaced the pressure springs on most of its thief hatches (increasing the setting in nearly all cases to 16 ounces per square inch) and replaced all the pit flares used at well pads on the FBIR to control storage tank vapors with engineered flares designed to reduce VOC by 98%.

Following the inspections, EPA sent Slawson a request for information pursuant to Section 114, of the Act, 42 U.S.C. § 7414, about many of the well pads that were inspected. In response, Slawson provided extensive data to EPA, including information about the vapor control systems. Based upon the evaluation of this information, the United States alleged that many of Slawson's vapor control systems were inadequately sized and designed to route all VOC emissions from the storage tanks to the control device so as to maintain compliance with regulatory requirements for control of VOC emissions, both on and off the FBIR.

## B.  Regulatory Background

### 1.  Fort Berthold FIP

In 2013, EPA promulgated a Federal Implementation Plan ("FIP") for the Fort Berthold Indian Reservation. The Fort Berthold FIP includes basic air quality regulations for the protection of public health and the environment. Among other things, the Fort Berthold FIP requires owners and operators of oil and natural gas production facilities to reduce VOC emissions from production and storage operations.

As set forth in the Fort Berthold FIP:

1.  "Each owner or operator must operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere." 40 C.F.R. § 49.4164(a).

2.  Within 90 days of the first date of production, "each owner or operator must . . . [r]oute all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tank interconnected with the produced oil storage tanks through a closed vent system to . . . [a]n enclosed combustor or utility flare capable of reducing the mass content of VOC . . . by at least 98.0 percent." 40 C.F.R. § 49.4164(d)(2).

3.  "Each owner or operator must equip all openings on each produced oil storage tank . . . with a cover to ensure that all natural gas emissions are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare." 40 C.F.R. § 49.4165(a).

4.  "Each cover and all openings on the cover (e.g., access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank." 40 C.F.R. § 49.4165(a)(1).

5.  "Each cover opening shall be secured in a closed, sealed position (e.g., covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except during those times when it is necessary to use an opening [to add or remove material, inspect or sample material, or inspect or repair equipment]." 40 C.F.R. § 49.4165(a)(2).

6.  "Each thief hatch cover shall be weighted and properly seated." 40 C.F.R. § 49.4165(a)(3).

5

7. "Each PRV shall be set to release at a pressure that will ensure that natural gas emissions are routed through the closed-vent system to the . . . enclosed combustor . . . under normal operating conditions." 40 C.F.R. § 49.4165(a)(4).

8. "Each closed-vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by [40 C.F.R. § 49.4165(a)]." 40 C.F.R. § 49.4165(b)(1).

9. "All vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment must be maintained and operated properly at all times." 40 C.F.R. § 49.4165(b)(2); and

10. "Each closed-vent system must be designed to operate with no detectable natural gas emissions." 40 C.F.R. § 49.4165(b)(3).

The Fort Berthold FIP expressly prohibits the use of pit flares to control storage tank emissions, except in limited circumstances not applicable here. *See* 40 C.F.R. §§ 49.4164(d)(2) and 49.4165(d)(2).

## 2. <u>North Dakota SIP</u>

Each State must adopt and submit to EPA for approval a plan that provides for the attainment, maintenance and enforcement of the national ambient air quality standards ("NAAQS") for each criteria pollutant. 42 U.S.C. § 7410(a)(1). This plan is known as a state implementation plan or "SIP." Each SIP must include enforceable emissions limitations to assure attainment of the NAAQS. 42 U.S.C. § 7410(a)(2)(A). After these limitations are approved by EPA, they are federally enforceable under Sections 113(a) and (b) of the Act, 42 U.S.C. §§ 7413(a) and (b).

Ground-level ozone, commonly known as "smog," is one of six criteria pollutants for which EPA has promulgated NAAQS. *See* 78 Fed. Reg. 9823 (Feb. 12, 2013). Short-term exposure to ozone (1 to 3 hours) can cause acute health effects even at low concentrations,

6

including temporary pulmonary inflammation. Long-term exposure (months to years) may cause permanent damage to lung tissue. Children and adults who are active outdoors are particularly susceptible to the effects of exposure to ozone. *See* 62 Fed. Reg. 38856 (July 18, 1997).

Ozone is not emitted directly from sources of air pollution. Ozone is a photochemical oxidant, formed when certain chemicals in the ambient air react with oxygen in the presence of sunlight. These chemicals – VOC and nitrogen oxides ("NOx") – are called "ozone precursors." Sources that emit ozone precursors are regulated to reduce ground-level ozone. *See* 62 Fed. Reg. 38856 (July 18, 1997).

As required by the Act, North Dakota has periodically adopted regulations to provide for the attainment, maintenance and enforcement of the NAAQS for ground-level ozone. On June 1, 1992, North Dakota adopted the current version of the North Dakota Air Pollution Control Rules ("NDAPCR") 33-15-07-02, and on June 30, 1992, the Governor of North Dakota submitted it to EPA as a revision to the North Dakota SIP. 40 C.F.R. § 52.1837(c)(26)(i)(A).

NDAPCR 33-15-07-02 sets forth VOC emission reduction requirements for sources. Pursuant to 33-15-07-02.1, no person "may cause or permit the emission of organic compounds gases and vapors, except from an emergency blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by" the North Dakota Department of Health ("NDDH"). This provision became federally enforceable on October 20, 1995, the date EPA's rule approving these provisions as part of the North Dakota SIP became effective. *See* 60 Fed. Reg. 43396 (Aug. 21, 1995).

## C.  Summary of Key Settlement Terms

### 1.  Injunctive Relief

#### a.  Engineering evaluations and modifications, as needed, along with an ongoing DI/PM program with semi-annual IR camera inspections

As part of the settlement, Slawson must complete an engineering evaluation with certain minimum considerations identified in the Decree for each of its vapor control systems in North Dakota. Decree ¶ 9. If the engineering evaluation indicates that the capacity or design of the vapor control system is inadequate, Slawson must make all necessary modifications to ensure adequate sizing and design. *Id.* Proper operation and maintenance will be verified by a weekly directed inspection and preventative maintenance ("DI/PM") program and semi-annual IR camera inspections of all storage tanks, all associated combustion devices, and all other components at each well pad (beginning with and moving downstream from the first valve off the wellhead, with the exception of components located in a heater-treater shed). *Id.* at ¶ 12. In addition, Slawson must evaluate the condition of thief hatches and mountings on each storage tank. *Id.* at ¶ 9(b).

The settlement also requires Slawson to retain a third-party auditor to review all of the engineering evaluations and perform an IR camera inspection of all tanks, associated control devices, and any open-ended lines at each well pad. Decree ¶ 15. If the auditor finds emissions from 5% or more of the total number of thief hatches or if 5% or more of the combustion devices have a common problem (e.g., no pilot light present), Slawson must do a root cause analysis to determine underlying causes and identify corrective actions. *Id.* at ¶ 15(e).

Finally, Slawson must install analog pressure monitors (i.e., monitors with a manual reading display of the highest pressure measurement) on 50% of its tank systems and electronic pressure monitors (i.e., monitors with continuous data readings recorded electronically) at tank

systems receiving produced oil from Slawson's top 20% highest producing wells. *See* Decree ¶ 16-17. These monitors will provide Slawson with information to help verify that tanks are not being over-pressurized as a result of inadequate vapor control system capacity or design. High readings will trigger investigation and follow-up actions.

### b.  Replacement of pit flares used to control storage tank emissions at all sites, both on and off the FBIR

The Decree requires Slawson to replace all pit flares used to control storage tank emissions on the FBIR. *See* Decree ¶ 14(c). This will bring those well pads into compliance with the Fort Berthold FIP. The Decree also requires Slawson to replace all pit flares used to control storage tank emissions on state land. *Id.*

To address operational issues, the Decree requires Slawson to perform weekly checks of control devices for presence of pilot lights and absence of visible smoke emissions. *See* Decree ¶ 12. Slawson must use an IR camera semi-annually to ensure that VOCs are not being vented to the atmosphere from a control device without the presence of a flame indicating combustion. *Id.* at ¶ 12(e).

### 2.  Mitigation Projects

As part of the settlement, Slawson must complete two environmental mitigation projects. *See* Decree Section V and App. B.

The first project requires Slawson to spend at least $1.5 million to install auto-gauging equipment on its storage tanks. Slawson, like most operators in the Bakken, measures oil sales by dropping a glass vial and tape measure through the thief hatch on the storage tank. Because the tanks are under a slight positive pressure, whenever the thief hatch is opened, vapors, which collect in the headspace of the tank, are released to the atmosphere. In addition to the environmental harm, this practice creates risks to worker health and safety. The installation of

auto-gauging equipment will allow Slawson to measure the contents of its tanks without opening the thief hatch. By reducing the number of times that thief hatches are opened, emissions are reduced. Based on Slawson estimates, this project is expected to result in the installation of auto-gauging equipment at approximately 36 vapor control systems serving 109 wells and reduce VOC emissions by roughly 180 tons per year of VOC and five tons per year of HAP.

As a result of the second project, Slawson will reduce NOx emissions from all drill rigs used by Slawson in North Dakota during the life of the Decree. These reductions will be achieved by either: 1) using electrification to power the rig, 2) using a selective catalytic reduction ("SCR") module as an add-on control for the drill rig exhaust, or 3) retrofitting the engines with NOx controls. While it is uncertain how many rigs Slawson will use in the future, Slawson has committed to reduce NOx emissions (in one of the three ways mentioned above) from each and every drill rig it uses in North Dakota while the Decree is in effect. Slawson estimates that the drill rig controls will cost approximately $550,000 per drill rig. The amount of emissions reductions is dependent on a number of factors, including the number of rigs used, as well as the number of hours each of these rigs is used, during the life of the Consent Decree.

### 3.  **Civil Penalty**

Under the Decree, Slawson would pay a $2.1 million civil penalty. Decree ¶ 27.

### 4.  **Effect of Settlement**

Entering into and complying with the proposed Decree will release Slawson from all past civil liability at the tank systems and associated vapor control systems for violations of the Fort Berthold FIP and the North Dakota SIP provisions that address VOC emissions. *See* Decree ¶¶ 65-66.

10

**D.  Public Comment on Proposed Consent Decree**

Pursuant to 28 C.F.R. § 50.7, the United States, although signing the Consent Decree, conditioned its approval on public notice and comment. *See* Decree ¶ 89. The United States reserved the right to withdraw its consent to the settlement if public comments demonstrated that final approval would be inappropriate, improper, or inadequate. *Id*. Slawson has signed and fully approved the Consent Decree and has consented to its entry without further notice. *Id*.

After lodging the Consent Decree, the United States published in the Federal Register a notice of lodging of the Decree and an opportunity to comment upon the settlement. *See* 81 Fed. Reg. 88270 (Dec. 7, 2016). The 30-day period for public comment has expired. The United States received two comments. As discussed below, neither comment provides a basis for the United States to withdraw its consent nor justifies any delay in the Court's approval of the settlement.

## II.  ARGUMENT

**A.  Standard for Judicial Review of a Consent Decree**

Approval of a consent decree is within the informed discretion of the Court. *See United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). That discretion generally should be exercised in favor of the settlement of litigation. *See Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1984); *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1372 (6th Cir.), *cert. denied*, 429 U.S. 862 (1976). The "presumption in favor of voluntary settlement . . . is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436.

11

In reviewing a consent decree, the Court must determine whether it is fair, adequate, and reasonable, and consistent with the goals of the underlying legislation. *See United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997); *United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992); *United States v. Metro. St. Louis Sewer District (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992). While the court must conduct an "independent evaluation," it "may not substitute" its "own judgment for that of the parties to the decree." *Akzo Coatings*, 949 F.2d at 1436. Rather, the role of the court is to ensure that the settlement "is not illegal, a product of collusion, or against the public interest." *United States v. State of Colo.,* 937 F.2d 505, 509 (10th Cir. 1991). As long as the settlement was negotiated in good faith, a reviewing court should defer to the judgment of the United States and its agencies in settling a matter. *Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961) ("[S]ound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting."); *see also*, *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (noting that judicial deference "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement"). The Court does not have the power to modify a settlement; it may only accept or reject the terms to which the parties have agreed. *Akzo Coatings*, 949 F.2d at 1435; *Officers for Justice v. Civil Service Comm'n of City and Cty. Of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982).

The public policy favoring the resolution of litigation by settlement is particularly strong in environmental cases. *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1019, 1029 (D. Mass. 1989) ("Congressional purpose is better

served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation."). The consent decree is a "highly useful tool for government agencies," for it "maximizes the effectiveness of limited law enforcement resources" by permitting the government to obtain compliance with the law without lengthy litigation. *United States v. City of Jackson, Miss.*, 519 F.2d 1147, 1151 (5th Cir. 1975). The process of settlement is above all a process of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 319 n.10 (3d Cir. 1993).

Finally, deference should be granted to the Decree as an official act of the Attorney General,[1] who has "exclusive authority and plenary power to control the conduct of litigation in which the United States is involved, unless Congress specially authorizes an agency to proceed without the supervision of the Attorney General." *Hercules, Inc.*, 961 F.2d at 798 (citing 28 U.S.C. § 516; *F.T.C. v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968)). This authority places considerable discretion in the hands of the Attorney General to decide whether, and on what terms, to enter into a settlement. *Hercules*, 961 F.2d at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928)); *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) ("[T]he Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest.").

---

[1]  The Decree was approved by John C. Cruden, Assistant Attorney General of the Environment and Natural Resources Division of the Department of Justice, acting under authority delegated to him.

**B.  The Decree is Fair, Reasonable, Adequate, and Consistent with the Goals of the Act**

**1.  The Decree is Fair**

Determining whether a consent decree is fair involves both procedural and substantive components. *Ne. Iowa Citizens for Clean Water v. Agriprocessors, Inc.*, 469 F. Supp. 2d 666, 672 (N.D. Iowa 2006) (citing *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017 (8th Cir. 2002). To evaluate procedural fairness, "a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. Substantive fairness flows from procedural fairness. *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994). Substantive fairness "introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87.

The Decree is procedurally fair. It was reached after more than a year of protracted discussions of legal and technical issues through arms-length negotiations. These negotiations involved representatives of the United States and Slawson, including their legal counsel and environmental and operational specialists. The United States and Slawson each had competing interests throughout the negotiations. *See United States v. D.C.*, 933 F. Supp. 42, 49 (D.C.C. 1996) (finding the adversarial relationship between the parties relevant to assessing procedural fairness).

Once the terms of the Decree were negotiated among counsel, the resulting Decree was reviewed and approved by: (1) Slawson and its management hierarchy; (2) the Assistant Attorney General for the Environment and Natural Resources Division of the U.S. Department of Justice, John C. Cruden; (3) the Assistant Administrator of EPA's Office of Enforcement and

14

Compliance Assurance, Cynthia Giles; and (4) the EPA Region 8 Assistant Regional Administrator, Suzanne J. Bohan.

The United States was represented in the matter by the Environmental Enforcement Section of the U.S. Department of Justice; the Office of Enforcement, Compliance, and Environmental Justice for EPA Region 8; and EPA's Office of Civil Enforcement. All three entities have years of experience handling Clean Air Act enforcement cases like the one at issue here. Throughout the negotiations, Slawson was represented by sophisticated attorneys from the law firms of Bartlit Beck Herman Palenchar & Scott and Davis, Graham & Stubbs who are well-versed in the liability and defenses associated with the claims alleged in the Complaint.

The Decree is substantively fair. All of the allegations in the Complaint were addressed and the appropriate remedies for the violations were thoroughly evaluated and negotiated. The scope of the injunctive relief is broad and comprehensive: it applies to all of Slawson's well pads in North Dakota. The United States and Slawson both were represented by experienced counsel. These counsel view this settlement as a fair resolution of the claims asserted.

In contrast, litigation of the alleged violations would be lengthy, expensive, and resource-intensive. In recognition of the time and resources that litigation would require, the parties worked more than a year, involving many people and countless hours, to fashion a mutually acceptable compromise. The Decree reflects the parties' careful and informed assessment of the relative merits of the claims and defenses, while taking into consideration the costs and risks associated with litigating a case as technical as this to final resolution. The settlement embodies a measure of compromise on both sides. As with any fair settlement, both the United States and Slawson gain the benefit of immediate resolution of the United States' claims, while foregoing the opportunity to seek an unmitigated victory. *See Hiram Walker & Sons*, 768 F.2d at 889.

15

## 2.   The Decree is Reasonable, Adequate, and Consistent with the Goals of the Act

The Decree is reasonable, adequate, and consistent with the goals of the Act. The "reasonableness" of a decree can be determined based on whether it is technically adequate and compensates the public for the alleged violations in light of the risks of litigation. *See United States v. Union Elec. Co.*, 934 F. Supp. 324, 331 (E.D. Mo. 1996); *see also Cannons Eng'g Corp*, 899 F.2d at 89-90 ("[T]he reasonableness of the consent decree . . . will be basically a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial measures."). Reasonableness also accounts for the "relative strength of the parties' litigating positions" and "must take into account foreseeable risks of loss." *Cannons Eng'g Corp*, 899 F.2d at 90.

The Decree represents a reasonable resolution of the United States' claims. The Fort Berthold FIP and North Dakota SIP contain narrative standards for the control of VOC emissions from storage tanks, including a requirement to minimize emissions and a prohibition on causing or allowing emissions. *See* 40 C.F.R. § 49.4164(a); NDAPCR 33-15-07-02.1. The parties have agreed to terms that will effectively address the alleged violations and establish a forward looking paradigm to reduce VOC emissions and improve compliance. As described above, the Decree requires Slawson to conduct formal engineering evaluations, with minimum considerations, to ensure that each of its vapor control systems in North Dakota is adequately sized and designed so that storage tank vapors are not emitted during normal operations. Where the evaluation indicates that a vapor control system is not adequately sized and designed, Slawson must take corrective action within prescribed times or temporarily shut-in associated production operations. In addition to the engineering evaluations, the Decree requires Slawson to implement a DI/PM program to ensure ongoing operation and maintenance to minimize and

16

address VOC emissions. The efficacy of the engineering evaluations, operation, and maintenance will be verified on an ongoing basis by Slawson through regular inspections, tank pressure monitoring, and a third-party audit. Slawson has estimated that the cost of compliance with the Decree will be $4.1 million. When fully implemented, the Decree's injunctive relief is expected to reduce VOC emissions by thousands of tons per year.

In addition to the work mentioned above, Slawson will undertake two mitigation projects to offset past emissions and pay a $2.1 million civil penalty. The United States estimates that the civil penalty is roughly twice the economic benefit Slawson enjoyed by the delayed costs of completing the engineering evaluations and necessary corrective actions required by the Decree. A further increase of the penalty was not deemed necessary. Slawson cooperated with EPA by providing information relevant to the investigation, working through technical issues raised in discussions, and agreeing to injunctive relief addressing all of its operations in North Dakota.

While the United States believes it would have prevailed on its claims if litigated, litigation would not have been without risk. To avoid the relative risks and resources that litigation would have entailed, the United States and Slawson worked towards a settlement that ensures clear, quantifiable environmental benefits without the risks and potential delays associated with litigation.

Finally, the settlement is consistent with the Act and in the public interest. The Decree contains requirements for design, operation, maintenance, monitoring, recordkeeping, and reporting that will result in emissions reductions and benefit the public. The regulatory requirements in the Fort Berthold FIP and North Dakota SIP are intended both to ensure that North Dakota maintains its attainment status for the ozone NAAQS and to protect air quality from deterioration resulting from the release of VOC. Therefore, the Decree is consistent with

17

the Act and, indeed, furthers the express purpose of the Act: "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

## C.  Neither Comment Provides a Basis for Rejecting the Consent Decree

The United States received two comments on the proposed Decree. The first, attached as Exhibit A, was submitted by Shelly Ventsch, a resident of New Town. The second, attached as Exhibit B, was submitted jointly by the Independent Petroleum Association of America and the Western Energy Alliance (together, the "Associations").

### 1.  Ms. Ventsch's Comment

The term "reliable information," defined in Paragraph 6.gg of the Decree, is used to trigger certain requirements under the Decree. Simply put, reliable information means any observance of VOC emissions from certain locations at a well pad, by certain people, using certain methods. The "certain people" include the third-party auditor. *See* Decree at ¶ 6.gg.

In her comment, Ms. Ventsch asks the United States to reconsider allowing observations by the third-party auditor to be treated as "reliable information." Ex. A. She says that treating such observations as reliable information "borders on the fox guarding the henhouse." *Id.*

The term "reliable information" is used to define the scope of the requirements in Paragraph 13 of the Decree. In turn, Paragraph 13 requires Slawson to fix or temporarily shut-in a site, within specific deadlines, upon obtaining reliable information. If information does not meet the definition of reliable information these requirements in the Decree are not triggered. Removing the third-party auditor from the definition of reliable information would make the Decree less protective of public health and the environment, as it would narrow the sources of information that would qualify as reliable information and, thus, narrow the circumstances in

which these requirements would apply.[2] The United States does not believe that the

circumstances in which the requirements of Paragraph 13 apply should be narrowed and,

therefore, continues to support the definition of reliable information in the proposed Decree.

### 2.   The Associations' Comment

The Associations, in their comment, ask the United States to withdraw its consent to the

Decree based on three broad arguments. Specifically, the Associations argue that the Decree (1)

is inconsistent with EPA's "compliance and enforcement process," (2) is not in the public

interest, and (3) contains "technical infirmities." The United States has considered the

Associations' comment and does not find anything that would warrant modification of the

Decree or justify any delay in the Court's approval of this settlement.

### a.   Whether or not the Decree is consistent with EPA's "compliance and enforcement process" is irrelevant

The Associations argue that the Decree is "inconsistent with EPA's compliance and

enforcement process" because it (1) "omitted crucial steps" in a process identified on an EPA

informational website, (2) attempts to "regulate by decree," and (3) includes injunctive relief that

goes beyond regulatory requirements.

### i.   While irrelevant, EPA's approach to the Decree was consistent with the "compliance and enforcement process"

Pointing to an EPA informational website, the Associations argue that EPA did not

follow its "compliance and enforcement process" and, therefore, "the Consent Decree cannot be

justified." Ex. B at 3-5. This argument, however, has no bearing on whether the proposed Decree

---

[2] In addition to the third-party auditor, observations by (1) EPA, (2) North Dakota Department of Health, (3) Slawson employees, and (4) Slawson contractors trained to conduct inspections for emissions may also constitute reliable information. *See* Decree ¶ 6.gg (defining reliable information).

19

should be entered. That determination is based on whether the Decree is fair, reasonable, adequate, and consistent with the goals of the underlying legislation (here, the Clean Air Act). Whether EPA followed the general "steps" described on an informational website is not relevant to that inquiry.

That said, there is nothing in the approach to this settlement that is inconsistent with the six "steps" identified by the Associations from EPA's informational website: "(i) an environmental problem is identified [(i.e., air pollution)]; (ii) Congress passes laws to address environmental problems [(i.e., the Clean Air Act)]; (iii) EPA issues regulations to implement the laws [(i.e., the Forth Berthold FIP and the North Dakota regulations that were approved by EPA into the North Dakota SIP)]; (iv) the provision of 'compliance assistance helps the regulated community understand and comply with the regulation' [(e.g., EPA issues a compliance alert in September 2015 with a "purpose" to "help operators and state regulators identify and address compliance concerns" - available at https://www.epa.gov/sites/production/files/2015-09/documents/oilgascompliancealert.pdf)]; (v) compliance monitoring assesses compliance through inspections and other activities [(i.e., EPA has been conducting ongoing inspections and other compliance monitoring throughout the United States)]; and (vi) enforcement actions are initiated 'when the regulated community does not comply, or cleanup is required' [(e.g., EPA has initiated enforcement actions against operators where it has found non-compliance, including this action against Slawson)]." Ex. B at 3. Contrary to the Associations' assertion that the Decree holds Slawson to standards "lacking any legislative support and absent any statutorily authorized rulemaking," Ex. B at 3, the allegations and releases contained in the Decree are rooted in statutorily-authorized regulations. As the Complaint and Consent Decree clearly state, the allegations and releases involve well-established provisions of the Fort Berthold FIP and the

20

North Dakota SIP. In the case of the North Dakota SIP, the relevant provision has been in North Dakota's federally-approved SIP since 1995. *See* 60 Fed. Reg. 43396 (Aug. 21, 1995). The FIP and SIP standards address VOC emissions as a precursor to ozone, a criteria pollutant. Reductions in methane and ethane are co-benefit pollutant reductions and any references thereto are merely a recognition of this fact.

Further, the Associations are incorrect in their assertion that the Decree "omits any consideration of Slawson's compliance efforts from the enforcement process." Ex. B at 4. EPA accounted for Slawson's compliance efforts throughout the negotiation process and in applying the Clean Air Act Stationary Source Penalty Policy, which uses duration of violation as a factor in calculating penalties and allows for a "cooperation" adjustment downward based on a company's corrective actions after learning of a violation. *See* Clean Air Act Stationary Source Penalty Policy (Oct. 25, 1991) at 11-12, 17. Regardless of how EPA accounted for Slawson's compliance efforts, however, those efforts did not eliminate the need for injunctive relief to identify and address the underlying causes of emissions and bring Slawson's vapor control systems into compliance with the relevant standards.

Lastly, the Associations argue that including all of Slawson's North Dakota operations in the settlement "subverts EPA's obligation to prove violations by a preponderance of the evidence before issuing civil penalties." Ex. B at 4. The Associations' argument is misplaced. The burden of proving violations by a preponderance of evidence is a standard that applies in litigation. This standard is wholly inappropriate to the inquiry of whether the Decree, negotiated by the parties to avoid litigation altogether, should be entered by the Court. The Decree, by its very nature, ensures that "each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated

victory," including arguments that would take place during litigation, after extensive opportunity for further discovery, regarding whether EPA has met its burden of proof. *Hiram Walker & Sons, Inc.*, 768 F.2d at 889 (7th Cir. 1985) (citing *Armour,* 402 U.S. at 681). The question before the Court is not the merits of Slawson's civil liability; indeed, the Consent Decree clearly states that "Slawson does not admit to the allegations in the Complaint nor does it admit any liability arising out of the transactions or occurrences alleged in the Complaint." Decree p. 4.

### ii.   The settlement is not an effort to "regulate by decree"

Next, based on the assertion that the Decree goes beyond the minimum requirements of the regulations, the Associations argue that the settlement represents an effort to "regulate by decree." Ex. B at 3. The Decree, however, is not a "regulation" because it binds no one but the parties.

This is an enforcement case. It is categorically not a regulation. The Decree is a settlement that resolves specific allegations in a complaint filed against a specific company. As a condition of the settlement, Slawson will comply with a number of requirements that EPA has determined to be necessary and appropriate relief for the claims alleged.

The Associations' comment appears to assume that a consent decree between two parties can be used "to strong arm private entities into 'consenting' to emission standards that have no basis in enforceable law." Ex. B at 3-4. While EPA can compel a defendant to comply with a rule, it cannot impose a consent decree on one. A settlement is, by definition, a voluntary agreement among the parties. In this case, Slawson agreed to the provisions required by the Decree. Companies like Slawson can choose not to settle with the United States when faced with allegations of noncompliance. In that event, the matter would be tried and a court would

22

determine the appropriate injunctive relief. No settlement will be, or could be, imposed on an unwilling party.

### iii. Entry of the Decree is appropriate even if it includes requirements that go beyond the regulations

The Associations argue that the injunctive relief in the Decree goes beyond the requirements of the regulations. *See*, *e.g.*, Ex. B at 3-4. The injunctive relief is designed to facilitate ongoing compliance with the Fort Berthold FIP and North Dakota SIP. Rather than numerical emissions limits, various provisions of the FIP and SIP contain qualitative, narrative requirements regarding the control of VOC emissions.[3] *See, e.g.*, 40 C.F.R. § 49.4164(a) ("Each owner or operator must operate and maintain all liquid and gas collection storage . . . so as to minimize leakage of natural gas"); *id.* at § 49.4165(b)(2) ("All vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to . . . any VOC control equipment must be maintained and operated properly at all times"); NDAPCR 33-15-07-02 (providing that no person "may cause or permit the emission of organic compounds gases and vapors, except from an emergency blowdown system or an emergency relief system, unless these gases and vapors are burned by flares or an equally effective control device"). The Decree makes no attempt to set a zero emissions standard as the Associations suggest. *See* Ex. B at 15. Accordingly, the Decree does not attach penalties to individual observations of emissions from Slawson's storage tanks; instead, penalties attach only if Slawson fails to investigate and correct the emissions observed.

---

[3] The requirement relating to the minimum destruction efficiency of control devices, 40 C.F.R. § 49.4164(d)(2), could be said to contain numerical standards, although they are not "emissions limitations" as that phrase is used by the Associations.

23

Further, as provided in Paragraph 14 of the Decree, the ongoing performance standards that apply under the Decree (after Slawson has completed the engineering evaluations and any modifications) are from the Fort Berthold FIP and North Dakota SIP. To the extent any injunctive relief in the form of mitigation projects goes beyond regulatory requirements, the United States is authorized to seek mitigation for past harm in consent decrees. *See e.g.*, *United States Pub. Interest Research Grp. v. Atl. Salmon of Maine*, 339 F.3d 23, 33 (1st Cir. 2003) ("Injunctive remedies for past harm commonly dictate future conduct so as to mitigate past harm. . . . To say that the injunction looks to the future does not alter the fact that it is rooted in past violations, nor prevent its aims or its effects from being remedial."); *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1063 (S.D. Ind. 2008) (recognizing that section 113 of the CAA "authorizes a court to award the full range of equitable relief," including mitigation).

At the most fundamental level, however, the Associations' comment can be dealt with in summary fashion because, even if the injunctive relief does go beyond the minimum required by the regulations, that would provide no grounds for rejecting the Consent Decree. "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy . . . ." *Metro Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980). The law does not compel a defendant to limit its agreement to the precise language of the underlying regulations. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004) (noting that a consent decree requiring implementation of programs not required by federal statute may be approved and enforced); *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("A federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial."). Slawson is a

24

sophisticated company well‑equipped to assess the costs and benefits of this settlement. The Associations' comment suggests, at most, that the United States secured a settlement especially favorable to the public interest and the Clean Air Act's objective to enhance and protect our nation's air quality.

### b.   The Decree is in the Public Interest

The Associations next argue that the Decree might not be in the public interest because, in essence, it could increase Slawson's cost of production, which could result in lower production from Slawson's wells and, therefore, lower tax and royalty revenue to the state and FBIR. The Associations imply that lower tax and royalty revenue could impact worthwhile government programs, such as school funding and infrastructure improvements. *See* Ex. B at 5.

This is pure speculation. Moreover, the argument ignores the tremendous public benefits that will result from the emissions reductions secured by the Decree and the fact that the Decree seeks to level the playing field among oil and gas operators by bringing Slawson into compliance with existing regulatory requirements and redressing harm from non-compliance with those requirements. The United States is confident that the settlement is consistent with and furthers the public interest.

Contrary to the Associations' assertion, enforcement of existing regulatory requirements does not "depress[] the value of the Slawson minerals specifically and place[] artificial constraints on the market for oil and gas minerals in North Dakota generally." Ex. B at 5. As previously discussed, the Decree requires compliance with existing, federally-enforceable regulations set forth in the Fort Berthold FIP and North Dakota SIP, and the Decree's requirements for design, operation, maintenance, monitoring, recordkeeping, and reporting facilitate compliance with those existing regulations. Multiple operators in North Dakota already

employ programs incorporating requirements specified by the Decree as part of their regular efforts to operate in compliance with the FIP and SIP.

To impute regulatory compliance costs to enforcement, rather than to the rulemaking process itself, by comparing costs to the status quo of non-enforcement and non-compliance would be antithetical to the regulatory process. Costs and benefits of regulatory provisions are appropriately evaluated at the time they are promulgated as part of the rule-making process, not at the time of enforcement as the Associations request here.

Further, the Associations assume, without offering any evidence, that the cost of complying with the Decree will result in "economic implications" and "meaningful consequences for third parties that the agency has not considered." *Id*. The estimated cost of complying with the injunctive relief and mitigation provisions is roughly $6.1 million over the duration of the Decree, which is modest compared to the overall costs of developing and producing oil and natural gas and does not support the Associations' blanket claim that the Decree will impact oil and gas development. *See*, *e.g.*, Gebrekidan, Selam, *Insight: Peak, pause or plummet? Shale oil costs at crossroads*, Reuters, May 17, 2012, http://www.reuters.com/article/us-usa-shale-costs-idUSBRE84G06620120517 (citing operator costs for bringing a single well into production as $5.5 million to $8.5 million). Considering the costs of complying with the injunctive relief and mitigation projects relative to emissions benefits and overall operating costs, the Associations have made only general assertions of attenuated impact on the "oil and gas industry, the State of North Dakota, [and] the Fort Berthold Tribe." Ex. B at 6. These assertions do not support denial of the Motion to Enter nor any modification to the Consent Decree.

26

**c.  The Decree does not contain "technical infirmities" that justify rejecting the settlement**

Finally, the Associations argue that the Decree contains various "technical infirmities." Each of these arguments is addressed below.

The Associations assert that EPA has not explained how it determined that an "emissions limitation was exceeded" without reporting tank vapor compositions or flow rates from leaking storage tanks. Ex. B at 6-7. First, as discussed above, the regulatory standards in the Fort Berthold FIP and North Dakota SIP are not numerical limitations on VOC emissions. Second, EPA is not required to explain, in seeking approval of a settlement, how it determined that a violation occurred. *See Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) ("[N]either the trial court in approving the settlement nor this Court in reviewing the approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.") (quotation omitted); *Vill. of Arlington Heights*, 616 F.2d at 1014 ("The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy.") Third, even though not required, EPA in the Complaint and Consent Decree did explain that the alleged violations were based on inspections and an evaluation of information submitted by Slawson in response to a Section 114 request.

The Associations argue that Slawson shouldn't be required to design its vapor control systems for "extreme data values," including peak instantaneous vapor flow rate because it will ultimately lead to problematic overdesign. Ex. B at 7. The Fort Berthold FIP and North Dakota SIP require control of VOC emissions from storage tanks, which are likely to experience variable gas flow rates during production operations. To achieve ongoing compliance, the vapor control systems must be designed and sized to handle the full range of variable gas flow rates

27

attributable to an operator's production operations. While true that the Consent Decree requires Slawson to develop a Modeling Guideline for certain peak and maximum inputs, those inputs are expressly confined to Slawson's Normal Operations, as defined by the Decree. In fact, the Decree defines "Instantaneous Vapor Flow Rate" as the "maximum instantaneous amount of vapors routed to a Vapor Control System during Normal Operations, including flashing, working, breathing, and standing losses, as determined using the Modeling Guideline." Decree ¶ 6.z. The Decree merely requires that Slawson identify the upper bounds of emissions that can be routed to a particular vapor control system during Normal Operations. Slawson can then choose to modify that vapor control system, as necessary, to ensure adequate design and sizing for those upper bounds or lower the peak instantaneous vapor flow rate (through operational controls for instance) to ensure those upper bounds are not reached. *See id.* ¶ 9.d. The Decree provides Slawson flexibility to avoid the issues referenced by the Associations.

The Associations argue that EPA overlooked that flash emissions during the transfer of liquids from the separator to the storage tanks are not "instantaneous" as the name implies, but rather occur over a period of time. Ex. B at 8. Nowhere does the Decree indicate that flashing occurs instantaneously. We assume that this comment pertains to the Decree's requirement that Slawson calculate the "Potential Peak Instantaneous Vapor Flow Rate" to each of its vapor control systems. Decree ¶ 9.a. That calculation must be performed pursuant to a written modeling guideline, which has been developed by Slawson. *Id.* at ¶ 7.b (noting that "Slawson submitted a Modeling Guideline to EPA for its review and comment on September 8, 2016"). The Associations' comment does not assert that they have reviewed Slawson's Modeling Guideline; therefore, it is unclear what, if any, specific issues the Associations are raising as to Slawson's proposed means of calculating Potential Peak Instantaneous Vapor Flow Rate, or as to

28

Slawson's treatment of flash emissions therein. The Associations further assert that "using average production rates for determination of flare rate is a sound approach to flare line sizing for Bakken facilities and more pragmatic than designing a vapor collection system on instantaneous fluid delivery and instantaneous flash rates" because, *inter alia*, the process is a compressible process and storage tanks have a large volume relative to the dump volume. Ex. B at 8. That the Associations claim to propose an approach to the Decree's engineering evaluation requirements that they assert would be "more pragmatic" for certain operations does not provide a basis for the United States to withdraw its consent to the Decree.

The Associations argue that the settlement requires Slawson to equip combustion devices used to control tank system vapors with continuous pilot lights and does not allow Slawson to use automatic ignitors instead. Ex. B. at 9. The Associations claim that continuous burning pilots may not be as effective as automatic ignitors, at least during extreme winter conditions. The Decree includes language aimed at bringing Slawson's operations into compliance with the Fort Berthold FIP and North Dakota SIP, but it also is a heavily-negotiated document that reflects Slawson's actual operations in North Dakota, including use of continuous pilot lights. Even if the Associations are correct in claiming that automatic ignitors would be more effective during extreme winter conditions, existing regulatory requirements allow Slawson to comply through the use of continuous pilot lights and the Decree reflects that allowance and election.

The Consent Decree provides that Slawson "shall ensure that every thief hatch is either welded or mounted with a suitable gasket to the Storage Tank in order to prevent VOC emissions at the attachment point to the Storage Tank." Decree at ¶ 9.b.1. The Associations argue that for a number of reasons, including future maintenance and challenges of proper welding, welding "should not be characterized as a generally acceptable practice in a judicial consent decree." Ex.

29

B at 9. The central purpose of this provision is to "prevent VOC emissions at the attachment point." Slawson has the option of achieving that purpose by using a method (mounting with a suitable gasket) to which the Associations do not object. That the Decree provides greater flexibility to Slawson than the Associations would find ideal on one or more isolated requirements does not provide a basis for the United States to withhold its consent to the Decree.

The Associations argue that there is no technical justification for requiring Slawson to install electronic pressure monitors at a subset of its highest producing sites and that these monitors are "limited in reliability." Ex. B at 9. The United States disagrees that there is "no technical justification" for electronic pressure monitors. Electronic pressure monitors allow continuous monitoring of storage tank pressures and, as the Associations note, provide "a preventative warning" of possible emissions events at the storage tanks. Ex. B at 13, footnote 64. With respect to the reliability of electronic pressure monitors, the Decree provides Slawson with a six-month performance optimization period to optimize the monitors' performance and reliability. Decree ¶ 17.a. The Decree also provides a mechanism for Slawson to discontinue operation of and remove one or more electronic pressure monitors if it is "infeasible or overly burdensome in relation to the benefits to continue operating one or more of the electronic pressure monitors." Decree ¶ 17.e. The Decree, therefore, provides mechanisms that directly address the Associations' concerns. Further, exceedances of a monitor's "trigger point" do not constitute violations of the Decree. Such exceedances merely require Slawson to investigate the high pressure reading and then implement corrective actions to address any issues or emissions identified.

The Associations request that EPA explain "the relevance of its references to methane and explain to what extent, if any, its enforcement action is premised on methane emissions." Ex.

30

B at 10. EPA's enforcement action is not premised on methane emissions. As discussed above, any reference to methane is in recognition of co-benefit methane reductions resulting from implementation of the Decree.

The Associations argue that EPA has not "offered any standard to which operators can refer to determine whether a particular facility is 'adequate' or described any method operators can use to calculate whether an individual vapor control system has 'sufficient capacity.'" Ex. B at 10. The Decree is not intended to provide a particular methodology for determining whether design of a particular vapor control system is adequate or has sufficient capacity. This is because, contrary to the Associations' apparent assertions in their comment, the Decree is neither a rule nor a guidance document intended to dictate a particular methodology or the use of "proprietary data" to determine vapor control system capacity. The Decree simply sets forth a process, with certain minimum considerations, for Slawson to then analyze and determine if it needs to implement operational changes or modifications to its vapor control systems to stop emissions observed at its storage tanks. Under the Decree, after Slawson completes its engineering evaluations and any necessary modifications, it will conduct initial and ongoing verifications, both with an IR camera and audio, visual, olfactory ("AVO") inspections, to confirm that its vapor control systems are adequate and have sufficient capacity to route emissions to the control devices for combustion. Decree ¶¶ 10, 12. A third-party auditor will also verify that engineering evaluations and any necessary modifications were completed. *Id.* at ¶ 15. If Slawson determines that modification of a vapor control system is necessary to address reliable information or comply with the performance standards, Slawson is required to evaluate whether similar modifications are necessary at other vapor control systems using the same engineering design standard. *Id.* at ¶ 11. This ongoing and recursive process allows Slawson to confirm the adequacy

31

of the performance of its vapor control systems and, thereby, compliance with the Fort Berthold FIP and North Dakota SIP requirements for control of VOCs.

The Associations state that EPA has not explained why it "continues to believe that [Slawson's] vapor control springs remain inadequate" and "that any of Slawson's facilities are non-compliant after the remedial work Slawson completed to address the problems EPA identified during its 2014 inspections. Ex. B. at 11. First, there is no obligation for EPA to include such explanations in the Complaint or Decree. The Associations assert that the Decree "does not describe any follow-up inspections that EPA might have conducted that would justify the penalties or enforcement procedures the Consent Decree would impose." Ex. B at 11. This presumes that enforcement actions for violations are only appropriate where a defendant does not promptly correct issues upon notice; the Clean Air Act contains no such affirmative defense to penalties and enforcement, and EPA is under no obligation to conduct follow-up inspections to prove that Slawson failed to take corrective action to come into compliance. However, despite the lack of obligation for such statements, the Decree notes that EPA requested extensive data from Slawson pursuant to its authorities under Section 114 of the Clean Air Act, and that the data was evaluated so as to identify that a number of Slawson's storage tanks "were equipped with Vapor Control Systems that did not have sufficient capacity to route all the vapors from the Storage Tanks to control devices." *See* Decree at p. 3. While the Decree goes on to acknowledge Slawson's efforts to-date to bring its operations into compliance, nothing in the Decree or the Complaint asserts that EPA believes that Slawson's capacity issues were entirely cured by the thief hatch spring replacement program alone. While the United States acknowledges that Slawson has made significant strides towards compliance, the injunctive relief requirements in the Decree are intended to facilitate a full return to compliance with the relevant regulatory

provisions, including through implementation of an ongoing, improved program for operation and maintenance to address emissions not attributable to inadequate design.

The Associations claim that the requirement to develop a Modeling Guideline is "needlessly punitive and unjustified" and "serves no purpose." Ex. B at 12. As discussed above, the Consent Decree requires that Slawson account for certain minimum considerations in developing a Modeling Guideline, but otherwise allows Slawson flexibility in tailoring this guideline for its evaluation of its operations. Slawson is therefore able, and expected, to incorporate existing, peer-reviewed equations of state, methods, etc., so long as its Modeling Guideline ultimately accounts for the minimum considerations included in the Decree. Whether the Modeling Guideline Slawson prepares "will assist other members of the oil and gas industry," *id.*, is irrelevant to the inquiry before this Court: whether the Decree should be entered.

The Associations contend that the use of analog pressure monitors is not required to meet the regulatory requirements and that there are other ways or gauges that can "adequately provide insight on operations." Ex. B at 12. Analog pressure monitors provide information that can help identify emissions events at storage tanks. That there may be other gauges capable of providing "insight on operations" is irrelevant to whether the Consent Decree should be entered.

The Associations claim that the Decree imposes "onerous inspection requirements" whenever tank pressures exceed the "Trigger Point." Ex. B at 12. Further, the Associations assert that the "Trigger Points" are "random" and "untied to any engineering or technical basis." Ex. B at 13. The Associations assert that "[r]equiring a full inspection any time a 'trigger point' is reached is clearly excessive. As the discrepancy between scenarios involving the sixteen-ounce and eight-ounce springs demonstrates, a trigger point is at best a preventative warning and does

33

not provide documentation that an emission has occurred." Ex. B at 13, footnote 64. The Associations' characterization of the role of the "trigger points" as a preventative warning is consistent with their role under the Decree. Notably, the definition of "reliable information," which imposes a requirement for corrective actions to address the issue or emissions, is not triggered by exceedances of pressure monitor "trigger points," nor is an exceedance of the "trigger points" a violation of the Decree that would subject Slawson to stipulated penalties for non-compliance. Instead, Slawson is required by the Decree to check the monitor and do an IR Camera Inspection or AVO inspection of the Tank System to confirm that the monitor is properly functioning and to determine if emissions are occurring. If the "trigger point" continues to be exceeded at the same Tank System, then Slawson would be required to perform an investigative process to try to identify the root cause, and any contributing causes. IR camera and AVO inspections are routine practices among operators in North Dakota, so the United States disagrees with the Associations' characterization of these inspection requirements as "onerous." In the event that the Associations' concern actually occurs, pursuant to Paragraph 17.d of the Decree, Slawson can request a change to the electronic pressure measurements that will trigger investigative actions. Settlements are the result of compromise, which necessarily involve a give and take on both sides. Each individual term should not be isolated and evaluated for perfection to determine whether a settlement is an appropriate resolution to the parties' dispute. That the Associations might have drafted a different "trigger point" does not support a conclusion that the trigger points are "random" or that the United States should withdraw the Decree.

The Associations focus on one "whereas" clause to the Decree and assert that EPA's description of flash gas is "misleading because it fails to acknowledge that the more significant 'flash' occurs when the liquids flow from the wellhead to the three phase separator." Ex. B at

13–14. The Associations claim that "EPA must clarify certain aspects of the Consent Decree to ensure that the public has a clear understanding of the bases for each component of the Consent Decree and to confirm that EPA has adequate justification for the penalties imposed." Ex. B at 13. As an initial matter, the Associations appear to misunderstand the role and import of a "whereas" clause. The United States notes that "whereas" clauses are not enforceable conditions of the settlement. Further, while the whereas clauses for this Decree do try to provide some basic orientation to the operations at issue in this case, whereas clauses do not typically, and are not required to, identify "the bases for each component of the Consent Decree" nor are they required to, or designed to, "confirm that EPA has adequate justification for the penalties imposed." First, the pleadings in the Complaint identify the bases of the claims at issue and the authority for seeking penalties and injunctive relief. Second, the Associations are incorrect in their assertion that EPA "mischaracterizes the nature of the activities being regulated through the Consent Decree." Ex. B at 13. The Decree states that "Produced Oil and Produced Water are separated from natural gas" and then specifies that "the Produced Oil and Produced Water, also known as 'Pressurized Liquids,' are emptied into Storage Tanks." Decree at p. 3. There is no statement or insinuation that the natural gas that evolves in one or more separators in the process is transferred with the Produced Oil and Produced Water to the storage tanks, nor is an affirmative statement to the contrary required. The mere fact that the Associations would use different words or more details in a narrative description of the process does not provide a grounds for requiring revisions to the Decree.

The Associations assert that the term "malfunction" is inadequately defined. Ex. B at 15. The Decree's definition of "malfunction" is taken verbatim from existing EPA regulations at 40 C.F.R. § 60.2. That definition of "malfunction" is used for all EPA regulations contained in 40

C.F.R. Part 60, including regulations at Subpart OOOO promulgated for certain crude oil and natural gas production facilities. Therefore, the United States disagrees with the Associations' assertion that the definition "fails to account for the nature of the oil and gas production process." Ex. B at 15. Further, because the definition follows EPA's Part 60 regulatory definition verbatim, the Associations can reference numerous EPA policy statements over the past decades that provide additional guidance and framework for the definition. *See*, *e.g.*, Bennett, Kathleen M., *Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions*, (Sept. 28, 1982).

The Associations complain that the definition of "reliable information," which refers to any observation or detection of emissions, goes beyond the requirements of the applicable regulations and establishes a zero-emissions standard that is unachievable. Ex. B. at 15. The Associations fail to observe that nothing in the Decree states that an instance of "reliable information" is a violation of the Decree, nor does the Decree impose a stipulated penalty for each observation or detection of "reliable information." "Reliable information" merely triggers a requirement to investigate and perform corrective actions to address the emissions or issue identified. *See* Decree ¶ 13. As discussed above, because both the Fort Berthold FIP and the North Dakota SIP require routing of VOC emissions from storage tanks to control devices, compliance with those provisions requires corrective actions when emissions or issues are observed or detected. A Decree violation would only occur if Slawson failed to address the "reliable information" in accordance with the requirements of Paragraph 13 of the Decree and instead allowed the emissions or issue to continue without redress. *See* Decree ¶ 37.a. Therefore, the Associations are mistaken in characterizing the Decree as an unachievable, zero-emissions standard.

Finally, the Associations point to the provision that requires Slawson to notify EPA in the event that Slawson's operations or performance under the Decree may pose an immediate threat to the public health or welfare or the environment and assert that the Decree lacks "objective criteria by which a third-party could evaluate whether such a condition exists." Ex. B at 15. The Associations further assert that "it is not clear when this provision could ever be implicated" as North Dakota is in attainment status for the national ambient air quality standards. Ex. B at 15-16. The attempted connection between the NAAQS and the requirement to notify in the event of an immediate threat is misplaced. The ozone NAAQS establish standards to which year-round air quality data is compared in order to determine if the area is meeting the air-quality standards for ambient air. In contrast, an immediate threat to public health or welfare or the environment may be felt locally, before dispersion of pollutants, and so have little to no relationship to ambient air quality measurements. For example, the Billings Gazette recently reported on an oil tank explosion that occurred in the Bakken in Montana and resulted in three above-ground tanks burning. *See Oil tank explosion near North Dakota border felt miles away*, Billings Gazette, Jan. 11, 2017, http://bismarcktribune.com/news/state-and-regional/oil-tank-explosion-near-north-dakota-border-felt-miles-away/article_05e33210-4f07-50bc-87f5-22357ac340c4.html. Depending on the location of air quality monitors and the duration of the fire, it is unlikely that the explosion would have an impact on data used to determine whether Montana or North Dakota are meeting the NAAQS; however, it is likely that this type of event would appropriately trigger reporting as something that "may pose an immediate threat to the public health or welfare or the environment." In any event, the United States does not believe that the Decree's inclusion of such reporting requirements is inappropriate or requires revisions to the Decree.

## CONCLUSION

The Consent Decree substantially reduces air pollutants, requires payment of a significant civil penalty, secures important environmental mitigation projects, and resolves a complex matter without litigation and delay. It is fair, reasonable, adequate, and consistent with the goals of the Act. Accordingly, the United States respectfully requests that the motion to enter be granted and that the Consent Decree be signed (on page 68) and entered as an order of the court.


Respectfully Submitted,


JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


/s/ Mark C. Elmer
MARK C. ELMER
U.S. Department of Justice
Environmental Enforcement Section
999 Eighteenth Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844-1352 (voice)
(303) 844-1350 (fax)
Mark.Elmer@usdoj.gov

*Attorneys for the United States*


OF COUNSEL:

VIRGINIA SORRELL
JESSICA PORTMESS
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, Colorado 80202

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Memorandum in Support of Motion to Enter Proposed Consent Decree to be served on January 19, 2017 by first-class mail and email on:

Eric R. Olson
Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop Street
Suite 800
Denver, Colorado 80202
Eric.Olson@bartlit-beck.com

Randy Dann
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202
Randy.Dann@dgslaw.com

*Attorneys for Slawson Exploration Company, Inc.*

/s/ Mark C. Elmer
Mark C. Elmer