# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

Civil Action No.

United States of America,

               Plaintiff,

      v.

Slawson Exploration Company, Inc.

               Defendant.

---

## CONSENT DECREE

---

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | JURISDICTION AND VENUE | ........................................ | 4 |
| II. | APPLICABILITY | ........................................ | 5 |
| III. | DEFINITIONS | ........................................ | 6 |
| IV. | INJUNCTIVE RELIEF | ........................................ | 13 |
| V. | ENVIRONMENTAL MITIGATION PROJECTS | ........................................ | 35 |
| VI. | DEADLINE TABLE | ........................................ | 37 |
| VII. | CIVIL PENALTY | ........................................ | 38 |
| VIII. | PERIODIC REPORTING | ........................................ | 40 |
| IX. | STIPULATED PENALTIES | ........................................ | 43 |
| X. | FORCE MAJEURE | ........................................ | 49 |
| XI. | DISPUTE RESOLUTION | ........................................ | 51 |
| XII. | INFORMATION COLLECTION AND RETENTION | ........................................ | 53 |
| XIII. | EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS | ........................................ | 55 |
| XIV. | COSTS | ........................................ | 60 |
| XV. | NOTICES | ........................................ | 60 |
| XVI. | SALES OR TRANSFERS OF OPERATIONS | ........................................ | 61 |
| XVII. | EFFECTIVE DATE | ........................................ | 63 |
| XVIII. | RETENTION OF JURISDICTION | ........................................ | 64 |
| XIX. | MODIFICATION | ........................................ | 64 |
| XX. | TERMINATION | ........................................ | 64 |
| XXI. | PUBLIC PARTICIPATION | ........................................ | 67 |
| XXII. | SIGNATORIES/SERVICE | ........................................ | 67 |
| XXIII. | INTEGRATION/HEADINGS | ........................................ | 68 |
| XXIV. | FINAL JUDGMENT | ........................................ | 68 |
| XXV. | APPENDICES | ........................................ | 68 |

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), is filing a Complaint concurrently with the lodging of this Consent Decree, pursuant to Section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b). The Complaint alleges that Defendant, Slawson Exploration Company, Inc. ("Slawson"), violated requirements of the Act, the Federal Implementation Plan ("FIP") for Oil and Natural Gas Well Production Facilities, 40 C.F.R. Part 49, Subpart K (with respect to operations located on the Fort Berthold Indian Reservation ("FBIR")), and North Dakota's federally-approved State Implementation Plan ("SIP") (with respect to North Dakota operations located outside the FBIR), specifically North Dakota Air Pollution Control Rules ("NDAPCR") § 33-15-07-02, at Well Pads that are part of Slawson's oil and natural gas production system in the Williston Basin in North Dakota;

WHEREAS, Storage Tanks located on Well Pads store Produced Oil (i.e., hydrocarbon liquids) and Produced Water (i.e., water with residual hydrocarbon liquid impurities) until the liquids can be transported from the Well Pad by tanker trucks or pipelines to downstream processing operations for sale, reuse, or disposal. Produced Oil and Produced Water are separated from natural gas near the well-head in devices known as a "Separator" or a "Heater-Treater." After reaching pre-set levels in the Separator or Heater-Treater, the Produced Oil and Produced Water, also known as "Pressurized Liquids," are emptied into Storage Tanks kept at or near atmospheric pressure. As Pressurized Liquids are "dumped" (the term commonly used within the industry) into Storage Tanks, the pressure on the fluids decreases and vapors, which include volatile organic compounds ("VOCs") and hazardous air pollutants ("HAPs"), are released or "flashed" into a gaseous state. Such vapors are known as "flash gas." Additional vapors are released from the Produced Oil and Produced Water due to temperature fluctuations

1

and liquid level changes.  These are known as "working," "breathing," and "standing" losses;

WHEREAS, Well Pads are equipped with systems to route vapors from the Produced Oil and Produced Water Storage Tanks by vent lines to emission control devices;

WHEREAS, Well Pads located on the FBIR are subject to the FBIR FIP, including: the requirement to "operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere" (40 C.F.R. § 49.4164(a)); and the requirement to "[w]ithin ninety (90) days of the first date of production from any oil and natural gas well…[r]oute all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tank interconnected with the produced oil storage tanks through a closed-vent system to: (i) An operating system designed to recover and inject the natural gas emissions into a natural gas gathering pipeline system for sale or other beneficial purpose; or (ii) An enclosed combustor or utility flare capable of reducing the mass content of VOC in the natural gas emissions vented to the device by at least 98.0 percent or greater…" (40 C.F.R. § 49.4164(d));

WHEREAS, Well Pads located outside the FBIR are subject to certain requirements of the North Dakota SIP, including:  the requirement that "[n]o person may cause or permit the emission of organic compounds gases and vapors, except from an emergency vapor blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by the department" (NDAPCR § 33-15-07-02(1)); and the requirement that "[e]ach flare required under this section must be equipped and operated with an automatic ignitor or a continuous burning pilot" (NDAPCR § 33-15-07-02(3));

WHEREAS, the Complaint alleges that in 2014, inspectors from EPA inspected 41 of Slawson's Well Pads located in North Dakota, and using optical gas imaging infrared cameras

observed that certain Storage Tanks located at those Well Pads were emitting VOC to the atmosphere at the time of the inspection.  In many instances, the inspectors had complementary sensory observations of VOC emissions, including hydrocarbon odor, audio observations of hissing, and observations of visible wave refractions.  During the inspections, the inspectors also observed open thief hatches, impermissible use of pit flares at Well Pads located on the FBIR (i.e., more than 90 days from the first date of production of the associated wells), operation of pit flares with visible smoke emissions, operation of pit flares with VOC emissions from the pit flare observed through the use of the optical gas-imaging infrared camera when no combustion was taking place (i.e., VOC emissions without any flame presence), enclosed combustors and engineered flares with the pilot light off, and an open-ended line from Storage Tanks with VOC emissions observed through the use of the optical gas-imaging infrared camera;

WHEREAS, in response to a December 2014 request for information by the EPA pursuant to Section 114 of the Act, 42 U.S.C. § 7414, Slawson provided data to EPA regarding certain Well Pads.  This data included detailed analyses of samples of Pressurized Liquids and associated production data, as well as detailed information about the Vapor Control Systems at those Well Pads.  Based upon an evaluation of this data, the United States further alleges in the Complaint that a number of the Storage Tanks at Slawson's Well Pads were equipped with Vapor Control Systems that did not have sufficient capacity to route all the vapors from the Storage Tanks to control devices without first building pressure in the Storage Tanks that exceeds the set point of the pressure relief devices ("PRDs"), which in Slawson's Vapor Control Systems are thief hatches, such that vapors would have been emitted through the PRDs directly to the atmosphere without any combustion;

WHEREAS, Slawson represents that, beginning in 2015, Slawson conducted a

comprehensive field inspection and maintenance program and took steps, where necessary, to increase the pressure settings for its Storage Tank thief hatches, which Slawson represents are now set to appropriate operating pressures;

WHEREAS, Slawson further represents that it has replaced all the pit flares at Well Pads on the FBIR used to control standing, working, breathing, and flashing losses from Storage Tanks with control devices that meet the requirements of the Fort Berthold FIP;

WHEREAS, Slawson does not admit to the allegations in the Complaint nor does it admit any liability arising out of the transactions or occurrences alleged in the Complaint; and

WHEREAS, the United States and Slawson (the "Parties") recognize, and the Court by entering this Decree finds, that this Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Section 113(b) of the Act, 42 U.S.C. § 7413(b).  Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Slawson conducts business in, this judicial district.  Slawson consents to and shall not challenge entry of this Consent Decree or this Court's

jurisdiction to enter and enforce this Decree, and Slawson further consents to venue in this judicial district.  Except as expressly provided for herein, this Decree shall not create any rights in or obligations of any party other than the Parties to this Decree.  Except as provided in Section XXI (Public Participation) of this Decree, the Parties consent to the entry of this Decree without further notice.

2.      The State of North Dakota has actual notice of the commencement of this action in accordance with the requirements of Section 113 of the Act, 42 U.S.C. § 7413.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States, and upon Slawson and any successors, assigns, or other entities or persons otherwise bound by law.  Unless otherwise noted, the obligations of this Decree shall become enforceable on its Effective Date as provided in Section XVII (Effective Date).

4.      Slawson shall: (1) provide a copy of this Consent Decree to its President, Vice Presidents, General Counsel, Environmental Manager, and other managers or field supervisors who will be responsible for implementing the terms of this Consent Decree, and shall ensure that any employees and contractors whose duties might reasonably include compliance with any provision of this Consent Decree are made aware of this Consent Decree and specifically aware of the requirements of this Consent Decree that fall within such person's duties; and (2) place an electronic version of the Consent Decree on its internal environmental website.  Slawson shall be responsible for ensuring that all employees and contractors involved in performing any work pursuant to this Consent Decree perform such work in compliance with the requirements of this Consent Decree.

5.      In any action to enforce this Consent Decree, Slawson shall not raise as a defense to liability or a stipulated penalty the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Decree.  This section does not preclude Slawson from holding any employee, agent, or contractors of any tier who are alleged to have not complied with this Consent Decree liable for their actions.

### III.   DEFINITIONS

6.      For purposes of this Consent Decree, every term expressly defined by this Section shall have the meaning given that term herein.  Every other term used in this Decree that is also defined in the Act, 42 U.S.C. § 7401 et seq., in the regulations promulgated pursuant to the Act, or in the North Dakota SIP, shall mean in this Decree what such term means under the Act, those regulations, or the North Dakota SIP.  In the case of a conflict between federal and state definitions, federal definitions shall control.

a.      "Active Use" – A Tank System is in Active Use if it is connected to one or more Active Wells.  For a Tank System to be deemed "not in Active Use" under this Consent Decree, it must not be reasonably capable of receiving production from any and all Active Wells at the Well Pad and the liquids in each of the Storage Tanks must have been drawn down to the load lines.

b.      "Active Well" shall mean a well in which the completion interval is capable of producing hydrocarbons through the wellhead and where the well is currently in operation or may be restored to operation by opening valves or by energizing equipment involved in operating the well.

c.      "AVO" shall mean Audio, Visual, Olfactory.

d.      "Business Day" shall mean Monday through Friday, with the exception of

federal holidays.

  e.  "Calendar Day" shall mean any of the seven days of the week.  Unless specifically called for in the method of calculation (such as in Paragraph 17.b), in computing any period of time under this Decree expressed in Calendar Days (as opposed to Business Days), where the last Calendar Day would fall on a Saturday, Sunday, or federal holiday, the period shall not be extended to the next Business Day.

  f.  "Complaint" shall mean the complaint filed by the United States in this action.

  g.  "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto listed in Section XXV (Appendices).

  h.  "Date of Lodging" shall mean the date this Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of North Dakota.

  i.  "Day" or "day" shall mean a Calendar Day unless expressly stated to be a Business Day.  In computing any period of time under this Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, unless the time period is expressly stated to be in "Calendar Days" and not "days" or "Business Days," the period shall run until 11:59 p.m. Central Time of the next Business Day.

  j.  "Deadline Table" shall mean the table of deadlines included in Section VI. In the case of a conflict between a deadline in the text and the Deadline Table, the Deadline Table controls.

  k.  "Defendant" or "Slawson" shall mean Slawson Exploration Company, Inc.

  l.  "Effective Date" shall have the definition provided in Section XVII

(Effective Date).

m.      "Engineering Design Standard" shall mean an engineering standard developed by Slawson pursuant to Paragraph 8 (Engineering Design Standards).

n.      "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

o.      "Heater-Treater" shall mean a unit that heats the reservoir fluid to break oil/water emulsions and to reduce the oil viscosity.  The water is then typically removed by using gravity to allow the water to separate from the oil.

p.      "IR Camera Inspection" shall mean an inspection of a Vapor Control System using an optical gas imaging infrared camera designed for and capable of detecting hydrocarbon and VOC emissions, conducted by trained personnel who maintain proficiency through regular use of the optical gas imaging infrared camera.

q.      "Malfunction" shall mean any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

r.      "Modeling Guideline" shall mean the modeling guideline developed by Slawson pursuant to Paragraph 7 (Development of a Modeling Guideline).

s.      "NDDH" shall mean the North Dakota Department of Health.

t.      "Normal Operations" shall mean all periods of operation, excluding Malfunctions.  For Storage Tanks at Well Pads, Normal Operations includes, but is not limited to, liquid dumps from Separator(s) or Heater-Treater(s).

u.      "Operator" shall mean the principal on the bond covering a well, who is

8

responsible for drilling, completion, and operation of the well, including plugging and reclamation of the well site.

      v.    "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

      w.    "Parties" shall mean the United States and Slawson.

      x.    "Plaintiff" shall mean the United States.

      y.    "Potential Peak Instantaneous Vapor Flow Rate" shall mean the maximum instantaneous amount of vapors routed to a Vapor Control System during Normal Operations, including flashing, working, breathing, and standing losses, as determined using the Modeling Guideline.

      z.    "Pressurized Liquids" shall mean pressurized Produced Oil immediately upstream of the Storage Tank(s) or pressurized Produced Water immediately upstream of the Storage Tank(s).

      aa.    "Produced Oil" shall mean oil that is separated from extracted reservoir fluids during Production Operations.

      bb.    "Produced Water" shall mean water that is separated from extracted reservoir fluids during Production Operations.

      cc.    "Production Operations" shall mean the extraction, separation using Separators and or Heater-Treaters, and temporary storage of reservoir fluids from an oil and natural gas well at a Well Pad.

      dd.    "Project Dollars" shall mean Slawson's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Appendix B to the extent that such expenditures or payments both: (a) comply with the

requirements set forth in Section V (Environmental Mitigation Projects) and Appendix B; and (b) constitute Slawson's direct payments for such projects, or Slawson's external costs (e.g., for labor and equipment).

       ee.     "psi" shall mean pounds per square inch.

       ff.     "QA/QC" shall mean quality assurance and quality control.

       gg.     "Reliable Information" shall mean any observance or detection of VOC emissions either: 1) from a Storage Tank opening (i.e., PRD/thief hatch), except during gauging or maintenance; or 2) from a combustion device used in a Vapor Control System without flame presence indicating combustion.  Reliable Information must be observed or detected: 1) using an optical gas imaging infrared camera, EPA Method 21 monitoring, or AVO inspection; and 2) by EPA, Slawson employees, Slawson contractors trained to conduct inspections for emissions, or the consultant selected by Slawson to perform the third-party audit.  For purposes of this Decree only, evidence of past surface staining alone shall not be considered Reliable Information.  As to combustion devices used in a Vapor Control System, Reliable Information shall also include any observance or detection of Visible Smoke Emissions or no pilot light present by EPA, Slawson employees or Slawson contractors, or the consultant selected by Slawson to perform the third-party audit. Reliable Information shall also include any observance or detection of VOC emissions, Visible Smoke Emissions, or no pilot light present by NDDH, so long as NDDH communicates the observance or detection to Slawson in a writing that identifies the well pad, and for VOC emissions the emissions source (i.e., whether a Storage Tank or combustion device).

       hh.     "Section" shall mean a portion of this Decree identified by a Roman

10

numeral.

ii.     "Separator" shall mean a pressurized vessel designed to separate reservoir fluids into their constituent components of oil, natural gas, and water.

jj.     "Storage Tank" shall mean a unit that is constructed primarily of non-earthen materials (such as steel, fiberglass, or plastic) which provides structural support and is designed to contain an accumulation of produced reservoir fluids (i.e., Produced Oil or Produced Water).

kk.     "Tank System" shall mean one or more Storage Tanks, with at least one Produced Oil Storage Tank, that share a common Vapor Control System.  The "Tank Systems" that are subject to this Consent Decree are listed in Column one  of Appendix A, which lists all Tank Systems on Well Pads owned or operated by Slawson in North Dakota as of the date of lodging.

ll.     A "Tank System Group" shall mean Tank Systems with similar characteristics that can be subject to the same Engineering Design Standard developed pursuant to Paragraph 8.

mm.     "TPY" shall mean tons per year.

nn.     "Trigger Point," for purposes of Paragraphs 16 (Storage Tank Analog Pressure Monitors) and 17 (Electronic Tank Pressure Monitors), shall mean the lowest set point of any device designed to relieve pressure from a Tank System minus two ounces. Set point refers to the pressure (in ounces) at which a device is designed to relieve pressure.  For example, if a Tank System is equipped with two PRDs/thief hatches and the set point for one PRD/thief hatch is 12 ounces and the set point for the second PRD/thief hatch is 16 ounces, the "Trigger Point" would be 10 ounces (i.e., the lowest set

11

point of any device in the Tank System minus two ounces).

oo.   "United States" shall mean the United States of America, acting on behalf of EPA.

pp.   "Vapor Control System" shall mean the system used to contain, convey, and control vapors from one or more Storage Tank(s) (including flashing, working, breathing, and standing losses), as well as any natural gas carry-through to Storage Tanks.  A Vapor Control System includes a Tank System, piping to convey vapors from a Tank System to a combustion device and/or vapor recovery unit, fittings, connectors, liquid knockout vessels or vapor control piping, openings on Storage Tanks (such as thief hatches and any other pressure relief devices ("PRDs")), and emission control devices.

qq.   "VCS Root Cause Analysis" shall mean an assessment conducted through a process of investigation to determine the primary cause and contributing cause(s), if any, of VOC emissions from a Vapor Control System.

rr.   "Visible Smoke Emissions" shall mean visible smoke that is observed for more than five minutes in any two consecutive hours.  In the event that visible smoke is observed during operation of any emissions control device by EPA, a Slawson employee, a Slawson contractor trained to conduct inspections for emissions, or the consultant selected by Slawson to perform a third-party audit, EPA, Slawson or its contractor or consultant shall use EPA Reference Method 22 of 40 C.F.R. Part 60, Appendix A, to determine whether Visible Smoke Emissions are present.  The observation period shall be two hours or until visible smoke is observed for more than five minutes, whichever occurs first.

ss.   "VOC" or "VOCs" shall mean volatile organic compounds.

tt.    "Well Pad" shall mean a property with one or more Storage Tank(s) capable of receiving Produced Oil from Production Operations.  The Well Pads that are subject to this Decree are identified in column two of Appendix A. Column four of Appendix A lists whether the Well Pad is located on the FBIR or outside the exterior boundaries of the FBIR in the State of North Dakota.

### IV.    INJUNCTIVE RELIEF

7.    <u>Development of a Modeling Guideline</u>.  Slawson shall develop a written modeling guideline ("Modeling Guideline").  The purpose of the Modeling Guideline is to determine Potential Peak Instantaneous Vapor Flow Rate for purposes of designing and adequately sizing Vapor Control Systems at the Well Pads and Tank Systems subject to this Consent Decree and to provide procedures for achieving this objective.

a.    The Modeling Guideline shall address the following:

(1)    Flash emissions from the Produced Oil Storage Tank(s), and any Produced Water Storage Tank(s) connected to the Vapor Control System, including:

(a)    The maximum instantaneous liquid flow rate achievable during Normal Operations from the last stage of separation prior to the Storage Tank(s) to which the Vapor Control System is certified for operation in accordance with Paragraph 10 (Vapor Control System Initial Verification), including where relevant:

1)    Dump valve size and trim size;

2)    Size, length and fittings of the liquid transfer line between the last state of separation and the Storage

13

Tank(s);

3)     Consideration of simultaneous dump events to the same Tank System (unless all potential simultaneous dump events have been precluded through installation of timers, automation, or other measures);

(b)     The maximum potential flash emissions associated with liquid flow to the Storage Tank(s) during Normal Operations and conditions to which the Vapor Control System is certified for operation in accordance with Paragraph 10 (Vapor Control System Initial Verification), including where relevant:

1)     Maximum operating pressure and minimum temperature from the last stage of separation prior to the Storage Tank(s);

2)     Maximum potential flash gas to oil ratio and flash gas to water ratio;

3)     Use of Pressurized Liquids sampling data that reflects the highest potential for flash gas emissions representative of each producing pool, corrected to account for losses during sampling;

4)     Composition and properties (e.g., API gravity) of the hydrocarbon liquids (including consideration of the variability of such parameters and resulting

14

impact on the solution gas content of the

hydrocarbon liquids at a given pressure);

    (c)    If transient modeling is used, the duration and maximum frequency

of successive dump events;

    (2)    Evaporative working, breathing and standing losses;

    (3)    Any other potential vapor sources (e.g., transfer and loading

systems, blanket gas, purge gas, pneumatic devices) tied or to be tied into the

Vapor Control System;

    (4)    Documentation of all inputs, assumptions, calculation methods and

simulation tools to determine Potential Peak Instantaneous Vapor Flow Rate; and

    (5)    Potential uncertainty of the input data and results (e.g., validity of

empirical correlations, representativeness of samples, process conditions).

b.    Slawson submitted a Modeling Guideline to EPA for its review and

comment on September 8, 2016.  Slawson may periodically update the Modeling

Guideline as appropriate.

8.    <u>Engineering Design Standards</u>.  Slawson shall complete Engineering Design

Standards to assess whether Vapor Control Systems are adequately sized and properly

functioning.  The Engineering Design Standards may apply to Vapor Control Systems at

individual Tank Systems or to a Tank System Group as Slawson may determine appropriate.

a.    These standards shall include, as appropriate:

    (1)    A review of vapor control equipment installed on the Tank System

including equipment-specific considerations and any associated pressure losses

(e.g., from flame arrestor);

15

(2)	Identification of site-specific construction constraints (e.g., footprint limitations; setbacks; maximum equipment counts);

(3)	Size and design of the piping system between the Storage Tank(s) and the emissions control device, and the size and design of the emissions control device (including consideration of equivalent pipe length and back pressure valves or other restrictions on vapor flow);

(4)	Volume and duration of individual dump events; the nature of the flow of liquids to the Separator or Heater-Treater (i.e., steady flow, slug flow, intermittent flow (e.g., due to discrete well cycling events)); the minimum time between dump events; and the maximum number of dump events associated with a single well cycle with slug or intermittent flow;

(5)	Minimum available headspace in the Storage Tank(s); and

(6)	Engineering design considerations applied to account for issues associated with the Vapor Control System (e.g., fouling, potential for liquids accumulation in lines, winter operations) and variability of data.

b.	Slawson shall ensure that every combustion device used for emissions control in a Vapor Control System is equipped with a continuous pilot light.

c.	Slawson shall not use pit flares to control emissions from any Storage Tank at a Tank System.

d.	Slawson may rely on manufacturer specifications for individual components or pieces of equipment that are part of a Vapor Control System.

e.	These Engineering Design Standards shall be completed in sufficient time for Slawson to complete the engineering evaluations and any necessary modifications for

16

all of the Vapor Control Systems by the deadline in the Deadline Table.  Slawson may, but is not required to, submit the Engineering Design Standards to EPA for its review and comment.

9.     Vapor Control System Field Survey, Engineering Evaluation, and Modification.

a.     For each Tank System at a Well Pad, Slawson shall assess the Storage Tank(s) and associated equipment through a field survey or other appropriate means and apply the Modeling Guideline to determine the Potential Peak Instantaneous Vapor Flow Rate to the associated Vapor Control System.

b.     During the field survey, or other Tank System site visit, Slawson shall evaluate the condition of all PRDs/thief hatches, mountings, and gaskets at each Storage Tank at a Tank System, and the possibility of upgrading such equipment to reduce the likelihood of VOC emissions.  This evaluation shall include the following actions:

(1)     Slawson shall ensure that every thief hatch is either welded or mounted with a suitable gasket to the Storage Tank in order to prevent VOC emissions at the attachment point to the Storage Tank;

(2)     If while evaluating the PRDs/thief hatches, mountings, and gaskets, Slawson observes evidence of VOC emissions, except during gauging or maintenance, attributable to such PRDs/thief hatches, mountings, or gaskets, Slawson shall repair, replace, or upgrade such equipment, as appropriate; and

(3)     Slawson shall maintain records of the following information:

(a)     The date each Tank System underwent this evaluation;

(b)     The name of the employee who performed the evaluation;

(c)     Whether evidence of VOC emissions attributable to PRDs/thief

hatches, mountings, or gaskets was observed; and

(d)     What, if any, repair, replacement, or upgrade was performed,

including a description of the existing PRD/thief hatch, mounting,

or gasket, and a description of how that equipment was repaired or

with what it was replaced/upgraded.  Descriptions of PRDs/thief

hatches shall include pressure set points where such information is

available, and descriptions of PRDs/thief hatches, mountings, or

gaskets shall include the manufacturer and model where such

information is available.

c.     <u>Engineering Evaluation</u>.  Slawson shall then apply an appropriate

Engineering Design Standard to determine if the existing Vapor Control System at each

Tank System at a Well Pad is adequately designed and sized to handle the Potential Peak

Instantaneous Vapor Flow Rate that was calculated through application of the Modeling

Guideline pursuant to Paragraph 9.a ("Engineering Evaluation").  An Engineering

Evaluation is not required for a Vapor Control System at a Tank System that is not in

Active Use, that remains not in Active Use, and that is associated only with wells that are

plugged and abandoned before the termination of this Consent Decree.

d.     <u>Vapor Control System Modification</u>.  For those Vapor Control Systems

that are not adequately designed and sized based on the Engineering Evaluation, Slawson

shall make all necessary modifications to reduce the Potential Peak Instantaneous Vapor

Flow Rate (as recalculated using the Modeling Guideline) and/or increase the capacity of

the Vapor Control System in accordance with the applicable Engineering Design

Standard.  Slawson shall ensure that the modifications result in a Vapor Control System

18

that is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate, as determined through application of an Engineering Design Standard.

e.      Slawson shall complete all requirements of subparagraphs 9.a through 9.d for each Tank System at a Well Pad by the deadline in the Deadline Table for that Tank System's category.

f.      If Slawson has not completed an Engineering Evaluation (subparagraph 9.c) for a Tank System and any necessary modifications (subparagraph 9.d) by the applicable deadline in the Deadline Table for that Tank System's category, Slawson shall shut-in all Production Operations associated with that Tank System by such deadline until the requirements of subparagraphs 9.c and 9.d have been completed.

g.      In the event that Production Operations are temporarily shut-in, Slawson shall for the sole purpose of (i) undertaking an Engineering Evaluation at a Tank System, (ii) making necessary modifications pursuant to subparagraph 9.d (Vapor Control System Modification), or (iii) taking corrective actions pursuant to Paragraph 13 (Reliable Information, Investigation, and Corrective Action) be allowed to resume Production Operations associated with that Tank System for a period not to exceed five Calendar Days.  In the event that Slawson requires more than five Calendar Days of resumed Production Operations to accomplish one of the purposes identified in this subparagraph, Slawson may continue resumed Production Operations associated with that Tank System for up to an additional 10 Calendar Days provided that Slawson documents the reason and duration for continued Production Operations and submits that documentation as part of the next Semi-Annual Report that is due at least 30 days after the cessation of resumed Production Operations.

10.    <u>Vapor Control System Initial Verification</u>.  No later than 60 days after the applicable deadline in the Deadline Table for a Tank System category, Slawson shall complete the following for (i) all Tank Systems in that category and (ii) any Tank Systems for which associated Production Operations had been temporarily shut-in and which were resumed by the deadline for that category and not previously completed and submitted:

a.    Conduct an IR Camera Inspection of all Tank System openings (i.e., PRDs/thief hatches), emission control devices (i.e., VOCs not being emitted without flame presence indicating combustion), and open-ended lines during Normal Operations, including while Produced Oil is being sent to the Tank System from all associated Production Operations, to confirm the Vapor Control System is adequately designed and sized and not emitting VOC.  This inspection must be conducted pursuant to a written standard operating procedure prepared by Slawson and approved by EPA.  During the IR Camera Inspection, Slawson shall also confirm, for each combustion device in a Vapor Control System, that a pilot light is present and that there are no Visible Smoke Emissions.  A video record of each IR Camera Inspection done to comply with this Paragraph shall be recorded and kept on file;

b.    Comply with the requirements of Paragraph 13 (Reliable Information, Investigation, and Corrective Action) in the event VOC emissions are observed during the IR Camera Inspection from a Tank System opening, an open-ended line, or a combustion device without flame presence indicating combustion, or if a combustion device used for emissions control in the Vapor Control System does not have a pilot light present or has Visible Smoke Emissions; and

c.    Complete and submit to EPA a Certification of Completion Report that

documents in a spreadsheet or database format: (i) the design capacity of each Vapor
Control System in standard cubic feet per hour; (ii) the Engineering Design Standard
(which could be for an individual Tank System or Tank System Group) that was used for
each Vapor Control System, including identification of site-specific operational
parameters or practices relied upon for use of the Engineering Design Standard (e.g.,
measures to preclude simultaneous dump events, minimum available headspace in
Storage Tanks, practices to address liquids accumulation in vent lines); (iii) the calculated
Potential Peak Instantaneous Vapor Flow Rate in standard cubic feet per hour; (iv) the
maximum operating pressure to which the Engineering Design Standard is certified; and
(v) the date an IR Camera Inspection was completed and the results of such inspection.

11.     *Post-Certification of Completion Modifications*.  If, after Slawson has submitted
to EPA a Certification of Completion Report for a Tank System, Slawson determines that a
specific Vapor Control System needs to be modified to address Reliable Information or meet the
Performance Standards (Paragraph 14) in this Consent Decree, Slawson shall evaluate whether
similar modifications are necessary at other similar Vapor Control Systems using the same
Engineering Design Standard.  Slawson shall submit in the next required Semi-Annual Report:
(i) a summary of any evaluations of whether modifications were necessary at other Vapor
Control Systems and (ii) the timing, results, locations, and description of any modifications of
other Vapor Control Systems or a timeline for the completion of such modifications.

12.     *Directed Inspection and Preventative Maintenance Program*.  Slawson shall
develop and submit for review and approval by EPA a directed inspection and preventative
maintenance ("DI/PM") program by the deadline in the Deadline Table.  Slawson shall
implement the DI/PM program at each Tank System, and associated Well Pad, by no later than

21

the applicable engineering evaluation deadline in the Deadline Table for that Tank System's category.  Slawson is not required to implement the requirements of this Paragraph at a Well Pad where all Tank Systems are not in Active Use and remain not in Active Use, so long as Slawson, upon returning one or more Tank System(s) to Active Use, performs the actions specified in subparagraphs 12.a and 12.b at the Well Pad within seven days and performs the actions specified in subparagraph 12.e at the Well Pad within 30 days. Subparagraphs 12.a and 12.b shall be implemented weekly; subparagraph 12.e shall be implemented in accordance with the schedule set forth therein.  The DI/PM program shall:

    a.    Address system-wide inspection, response, and preventative maintenance procedures for the Vapor Control Systems, including:

    (1)    AVO walk-around inspection of all Tank Systems to check for VOC emissions (including while Storage Tank(s) are receiving Produced Oil from Production Operations), including checking for hissing, new stains, evidence of a spill, or other indicators of operational abnormalities.  The AVO walk-around inspection shall also check the following parameters, where relevant, on the following equipment:

    (a)    Well – presence of choke and surface flowing pressure.

    (b)    Separators and Heater-Treaters – final stage of separation maximum operating pressure and minimum temperature, set point of any device restricting final stage Separator or Heater-Treater dump flow rate, and valves in correct position.

    (c)    Tank System – PRDs/thief hatches (including that thief hatches are closed and latched), tank valve/load line/drain valve leaks, and

seals.

(d)     Vapor Control System – combustion device checks that burner is operational, no Visible Smoke Emissions, and presence of a pilot light, liquid knockout drained as necessary, inlet valves functioning properly, and auto-ignitor in good working condition.

(2)     Record the maximum pressure reading from any pressure monitor installed pursuant to Paragraph 16 (Storage Tank Analog Pressure Monitors) and reset the pressure gauge.

(3)     Check/verify common, system-wide operational parameters (temperatures, pressures, settings, etc.).

b.     Address any site-specific parameters or practices relied upon in the verification of a Vapor Control System (including those parameters or practices included in a Certification of Completion Report) by ensuring that such parameters or practices are identified on location and verified during the weekly inspection required by this Paragraph.

c.     Establish and implement requirements for appropriate documentation, which may include paper and/or checklists, of compliance with DI/PM practices and procedures so that the Parties can verify that the DI/PM program is being implemented.

d.     Establish and implement procedures for evaluation of performance of wear equipment to identify appropriate long-term maintenance, inspection, and replacement schedules (e.g., replacement of "wear" equipment).

e.     <u>Periodic IR Camera Inspections</u>.  Slawson shall undertake an IR Camera Inspection program at all Tank Systems, all associated combustion devices, and all other

components at the associated Well Pad, beginning with and moving downstream from the first valve off of the wellhead (but excluding components located in a Heater-Treater shed), that have the potential to emit VOCs in accordance with the following requirements:

(1)      IR Camera Inspections shall be performed on a semi-annual basis (January 1 through June 30 and July 1 through December 31).  These inspections must be conducted pursuant to a written standard operating procedure prepared by Slawson and approved by EPA.  During the IR Camera Inspection, Slawson shall also confirm, for each combustion device used in the associated Vapor Control System, that a pilot light is present and that there are no Visible Smoke Emissions.  An IR Camera Inspection of a Tank System and related combustion devices completed pursuant to subparagraph 10.a (Vapor Control System Initial Verification) during a semi-annual inspection period shall also count as an inspection for purposes of this Paragraph, so long as Slawson also inspected all other components at the associated Well Pad during that inspection, beginning with and moving downstream from the first valve off of the wellhead (but excluding components located in a Heater-Treater shed) that have the potential to emit VOCs.  These IR Camera Inspections shall begin by the applicable deadline in the Deadline Table.

(2)      In the event that VOC emissions from a Tank System opening (i.e., PRD/thief hatch), or from a combustion device used in the associated Vapor Control System without flame presence indicating combustion, are observed or detected during an inspection under this Paragraph, or that a combustion device is

24

observed to not have a pilot light present or to have Visible Smoke Emissions during an inspection under this Paragraph, Slawson shall comply with the requirements of Paragraph 13 (Reliable Information, Investigation, and Corrective Action).

(3)     In the event that VOC emissions from any component required to be inspected but not identified in subparagraph 12.e(2) are observed or detected during an inspection under this Paragraph, Slawson shall:

(a)     Complete all necessary corrective actions to address the VOC emissions as soon as practicable, but no later than 30 Calendar Days after detection of the fugitive emissions; or

(b)     If Slawson is unable to complete all necessary corrective actions to address the VOC emissions within 30 Calendar Days because the corrective actions are technically infeasible or would require a temporary shut-in of Production Operations, the corrective action must be completed during the next temporary shut-in of the relevant Production Operations or within two years, whichever is earlier.

(4)     Slawson shall maintain records of the following for each inspection and this information shall be provided in a spreadsheet with each Semi-Annual Report:

(a)     The date, time, Well Pad, Tank System, number of Storage Tanks inspected, and number of combustion devices

25

inspected;

(b)     The date and duration of any period where:  1) VOC

emissions are observed from a combustion device without

flame presence indicating combustion; 2) VOC emissions

are observed from a PRD/thief hatch or other openings on

Storage Tanks, except for VOC emissions that are

reasonably required for maintenance or gauging; 3) a

combustion device does not have a pilot light present or has

Visible Smoke Emissions; or 4) VOC emissions are

observed from any other component required to be

inspected under this Paragraph;

(c)     The model and manufacturer, where available, of any

combustion devices found with:  1) VOC emissions

observed without flame presence indicating combustion; 2)

no pilot light present; or 3) Visible Smoke Emissions; and

(d)     For any component, excluding those identified in

subaragraph 12.e(2), with VOC emissions observed or

detected: (i) the date, Well Pad, and a description of the

component and emissions; (ii) the date(s) corrective actions

were made, including a description of the corrective

actions.; and (iii) if corrective actions are delayed pursuant

to subaragraph 12.e(3)(b), a description of the reason for

delay.

13.   <u>Reliable Information, Investigation, and Corrective Action</u>.

a.      Within five Calendar Days after Slawson obtains any Reliable

Information, Slawson shall either (i) complete all necessary corrective actions to address

the VOC emissions or issue identified or (ii) temporarily shut-in Production Operations

associated with the Tank System.  The five day period in the preceding sentence to

complete all necessary corrective actions or temporarily shut-in shall be extended an

additional 10 Calendar Days due to any of the following: (1) parts are unavailable due to

back orders, shipment delay, etc.; (2) major safety concerns (specific reason must be

documented); and/or (3) unavailable outside resources after contacting a reasonable

number of vendors/contractors (specific reason and contacts must be documented).  In the

event that Production Operations are temporarily shut-in, Slawson shall proceed as

follows:

(1)      If the Tank System has not yet undergone an Engineering

Evaluation, Production Operations shall remain shut-in until the Engineering

Evaluation and any necessary modifications have been completed, and Slawson

shall comply with the requirements of subparagraph 10.a (Vapor Control System

Initial Verification) at that Tank System within 30 days of resuming any

Production Operations associated with that Tank System.

(2)      If the Tank System has already undergone an Engineering

Evaluation, Production Operations shall remain shut-in until completion of any

necessary modifications, including if appropriate a re-evaluation of the Vapor

Control System and Engineering Design Standard.  Slawson shall comply with the

requirements of subparagraph 10.a (Vapor Control System Initial Verification) at

27

that Tank System within 30 days of resuming any Production Operations associated with that Tank System.

b.      For each Tank System with associated Production Operations temporarily shut-in pursuant to the requirements of this Paragraph, Slawson shall document in a spreadsheet the following:

(1)      The date Reliable Information was obtained resulting in a temporary shut-in;

(2)      The Tank System identification;

(3)      The date that such Production Operations were temporarily shut-in;

(4)      The date modifications were made, including a description of the modifications;

(5)      The date that Production Operations were resumed; and

(6)      The date post-repair/Engineering Evaluation that an IR Camera Inspection was completed, and a summary of the results of that inspection.

c.      For each instance where Slawson obtains Reliable Information and within the deadline provided in subparagraph 13.a, above, completes all necessary corrective actions, Slawson shall document in a spreadsheet the following:

(1)      The date Reliable Information was obtained;

(2)      The identification of the Tank System; and

(3)      The date corrective actions were made, including a description of the corrective actions.

d.      Slawson shall attach copies of the spreadsheets required by this Paragraph to the next Semi-Annual Report that follows at least 30 days after corrective actions or

any required IR Camera Inspection is completed.

14.     <u>Performance Standard</u>.  Following the completion of an Engineering Evaluation and any necessary modifications at a Tank System, Slawson shall:

  a.     For all associated Vapor Control Systems located on the Fort Berthold Indian Reservation, comply with the applicable requirements of 40 C.F.R. Part 49, Subpart K.

  b.     For all associated Vapor Control Systems located outside the Fort Berthold Indian Reservation, not cause or permit the emission of organic compounds gases and vapors, except from an emergency vapor blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by NDDH, and ensure that each flare is equipped and operated with an automatic ignitor or a continuous burning pilot.

  c.     For all Tank Systems (both on and off the Fort Berthold Indian Reservation), ensure that emission control devices receiving Storage Tank emissions are capable of reducing the mass content of VOC in the natural gas emissions vented to the device by at least 98.0 percent or greater.

15.     <u>Third-Party Verification</u>.  Slawson's completion of the Engineering Evaluations and any necessary modifications shall be subject to verification by a third party as follows:

  a.     Slawson shall retain one or more qualified third-party consultants, not owned by Slawson or any of its subsidiary or affiliated companies (hereinafter "Auditor"), to conduct an audit of each Tank System.  The Auditor shall independently verify that the Engineering Evaluations and any necessary modifications were completed in accordance with the requirements of this Decree.

b.       By the deadline in the Deadline Table, Slawson shall notify EPA in writing of Slawson's recommended consultant(s), provide statements of qualification for the consultant(s), and provide the proposed audit work plan.  EPA shall either approve or disapprove the proposed consultant(s) and the proposed work plan.  If EPA has not responded within 30 days, Slawson's recommended consultant shall be deemed approved and Slawson may proceed with its proposed work plan.  In the event EPA disapproves the proposed consultant(s) and/or proposed work plan, EPA shall state the reasons for its disapproval of the consultant or proposed work plan in writing, and the process will be repeated with Slawson having 30 days from the date of disapproval to propose alternate consultant(s), provide statements of qualification, and/or provide a revised work plan to EPA.  In the event a consultant or work plan is not approved within 30 days of their submission, all deadlines in this Paragraph shall be extended by the number of days it takes to approve the consultant(s) and work plan minus 30 days. For example, if it takes 45 days to approve the consultant(s) and work plan, the deadline in this Paragraph would be extended by 15 days (i.e., 45 – 30 = 15).

c.       Once selected by Slawson and approved by EPA, Slawson shall have the Auditor conduct a document review of each Tank System to verify that Slawson has applied the Modeling Guideline and the applicable Engineering Design Standard so that the Vapor Control Systems are adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate.

d.       In addition to the document review, Slawson shall have the Auditor conduct an IR Camera Inspection of the following during Normal Operations, including when Produced Oil is being sent to the Tank System from all associated Production

30

Operations, for all Tank Systems:  1) all Storage Tank openings (i.e., PRDs/thief hatches); 2) all combustion devices used in the associated Vapor Control Systems (i.e., to ensure VOCs not being emitted without flame presence indicating combustion); and 3) any open-ended lines.  During the IR Camera Inspection, Slawson shall have the Auditor also confirm, for each combustion device used in the associated Vapor Control System, that a pilot light is present and that there are no Visible Smoke Emissions.  A video record of all IR Camera Inspections done to comply with this Paragraph shall be recorded and kept on file.

      e.      If 5% or more of the total number of thief hatches included in the audit have emissions observed or detected or if 5% or more of combustion devices included in the audit have a common problem (i.e., no pilot light present or VOCs being emitted without flame presence indicating combustion or Visible Smoke Emissions), Slawson shall complete within 90 days a VCS Root Cause Analysis and identify appropriate response actions to be taken to address any common operation, maintenance, or design cause(s) identified, along with a proposed schedule for the implementation of those response actions.  Appropriate response actions may include proactive solutions to maintenance problems (e.g., if thief hatches with gaskets greater than one year old are observed to have an increased failure rate, then a replacement schedule at or before one year after installation may be appropriate to implement pursuant to subparagraph 12.d (Directed Inspection and Preventative Maintenance Program)).  In the next Semi-Annual Report, Slawson shall submit the results of each VCS Root Cause Analysis, including the timeline for response actions if those are not already completed at the time of the submission of the VCS Root Cause Analysis.

f.      The document review and IR Camera Inspections referred to in this

Paragraph shall be completed by the deadline in the Deadline Table. Slawson shall have

the Auditor prepare a draft written report ("Draft Audit Report") marked as Confidential

Business Information describing such work and conclusions reached within 90 days after

completing the document review and IR Camera Inspections.  This Draft Audit Report,

and any drafts or other documentation prepared prior to such report, shall be shared by

the Auditor with the Parties simultaneously in accordance with Section XV (Notices).

The Draft Audit Report for each audit will be subject to review and comment by EPA;

provided, however, that Slawson shall have 30 days to review and address any EPA

comments on the Draft Audit Report before issuance of a Final Audit Report.

16.      Storage Tank Analog Pressure Monitors.  By the deadline in the Deadline Table,

at 50% of the Tank Systems, Slawson shall install, calibrate (in accordance with manufacturer

recommendations, if available), operate, and maintain one analog pressure monitor per battery of

Storage Tanks with head spaces manifolded together. For purposes of the 50% determination,

Slawson shall not count analog pressure monitors installed at Tank Systems that are not in

Active Use and for which Slawson intends to plug and abandon all associated wells.  Following

installation, Slawson will record the maximum pressure reading from the monitor installed under

this Paragraph each week as part of the weekly DI/PM program developed pursuant to Paragraph

12 (Directed Inspection and Preventative Maintenance Program).  These recorded values will be

kept in accordance with the requirements for appropriate documentation of compliance with

DI/PM practices and procedures that Slawson establishes pursuant to subparagraph 12.c.

a.      If the recorded maximum pressure reading is above the Trigger Point for a

Tank System, Slawson shall test the pressure monitor and the operating parameters of the

associated Tank System and while on site shall either conduct an IR Camera Inspection or an AVO inspection of the Tank System. In the event a Tank System has three recorded maximum pressure readings above the Trigger Point in a calendar quarter (e.g., January through March), Slawson shall conduct a VCS Root Cause Analysis.

   b.   Slawson shall maintain records of the following and this information shall be provided in a spreadsheet with each Semi-Annual Report:  (i) the date, location, and numerical value of all pressure readings in excess of the Trigger Point; and (ii) the date and results of all corresponding site investigations and all corresponding VCS Root Cause Analyses.

17.   <u>Electronic Tank Pressure Monitors</u>.  By the deadline in the Deadline Table, at all Tank Systems receiving Produced Oil from one or more of the top 20% highest producing wells (see Appendix A), Slawson shall install, calibrate (in accordance with manufacturer recommendations, if available), operate, and maintain one electronic pressure monitor per battery of Storage Tanks with head spaces manifolded together.  Each electronic pressure monitor shall continuously measure and record pressure data (i.e., one measurement every 15 seconds), which shall be stored onsite in a format that is capable of being downloaded for review. Each electronic pressure monitor shall be connected to a visual alarm at the Well Pad that lights up (and remains lit until manually reset) when a measurement has exceeded the Trigger Point.

   a.   For the first six months after the deadline for installation of electronic pressure monitors, Slawson shall have a performance optimization period to evaluate calibration and optimize electronic pressure monitor performance and reliability.  This period will allow Slawson, and its contractors or electronic pressure monitor vendors, an opportunity to ensure that the electronic pressure monitors, to the greatest extent

practicable, are producing quality data that may be used to identify the potential for over-pressurization of Tank Systems (e.g., optimization of electronic pressure monitor location, determination of electronic pressure measurements and frequency indicative of potential for over-pressurization).

b.      Following the performance optimization period, if an electronic pressure monitor measurement exceeds the Trigger Point for a Tank System (thereby triggering the visual alarm at the Well Pad), Slawson shall conduct a site investigation prior to resetting the visual alarm.  The investigation shall include a site visit to test the electronic pressure monitor and the operating parameters of the associated Tank System.  During the site visit, Slawson shall either conduct an IR Camera Inspection or an AVO inspection of the Tank System.  The investigation shall be completed no later than five Calendar Days following the date of the electronic pressure monitor measurement that exceeded the Trigger Point unless the fifth day would fall on a non-Business Day, in which case the investigation shall be completed by the end of the next Business Day.  In the event a Tank System requires three site investigations in a consecutive 30 Calendar Day period, Slawson shall conduct a VCS Root Cause Analysis.

c.      Slawson shall maintain records of the following and this information shall be provided in a spreadsheet (unless the Parties agree in writing to a different format) with each Semi-Annual Report:  (i) the date, time, location, and numerical value of all electronic pressure readings in excess of the Trigger Point; and (ii) the date and results of all corresponding site investigations and all corresponding VCS Root Cause Analyses.

d.      At any time, Slawson may submit to EPA a request for alternative criteria (e.g., pressure measurements and number of measurements in a given time period)

34

triggering a site investigation and/or VCS Root Cause Analysis.  EPA may grant or deny Slawson's request in whole or in part.

      e.      After at least 18 months of operation of the digital pressure monitors, including the six-month performance optimization period, if Slawson demonstrates and EPA determines that it is infeasible or overly burdensome in relation to the benefits to continue operating one or more of the electronic pressure monitors, Slawson may discontinue operation of and remove the electronic pressure monitor(s).  As part of Slawson's demonstration, Slawson shall submit to EPA an analysis of operation and maintenance of such monitors to date, including a summary of all measurements triggering site investigations or VCS Root Cause Analyses, the results of those site investigations or analyses, and corrective actions taken.  If EPA rejects Slawson's demonstration, such conclusions are subject to Section XI (Dispute Resolution). Operation of an electronic pressure monitor shall be considered infeasible if (i) the monitor cannot be kept in proper condition (including calibration) for sufficient periods of time to produce reliable, adequate, or useful measurements; or (ii) recurring, chronic, or unusual equipment adjustment, servicing, or replacement needs cannot be resolved through reasonable expenditures.

## V.    ENVIRONMENTAL MITIGATION PROJECTS

18.      Slawson shall implement the Environmental Mitigation Projects ("Projects") described in Appendix B in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree.  Slawson shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

19.     Slawson shall maintain and, within 30 days of an EPA request, provide copies of all documents to identify and substantiate the Project Dollars expended to implement the Projects described in Appendix B.

20.     All plans and reports prepared by Slawson pursuant to the requirements of this Section V (Environmental Mitigation Projects) and required to be submitted to EPA shall be made available to the public from Slawson upon request and without charge.

21.     Slawson shall certify, as part of each plan submitted to EPA for any Project, that Slawson is not otherwise required by law to perform the Project, that Slawson is unaware of any other person who is required by law to perform the Project, and that Slawson will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law.

22.     Slawson shall use its best efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Decree.

23.     If Slawson elects (where such election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of Slawson, but not including Slawson's agents or contractors, that person or instrumentality must, in writing to EPA:  (i) identify its legal authority for accepting such funding; and (ii) identify its legal authority to conduct the Project for which Slawson contributes the funds.  Regardless of whether Slawson elects (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, Slawson acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if Slawson demonstrates that the funds have actually been spent by either Slawson or by the

36

person or instrumentality receiving them, and that such expenditures meet all requirements of this Decree.

24. Slawson shall comply with the reporting requirements described in Appendix B.

25. In connection with any communication to the public or shareholders regarding Slawson's actions or expenditures relating in any way to the Environmental Mitigation Projects in this Decree, Slawson shall include prominently in the communication the information that the actions and expenditures were required as a part of a Decree.

26. Within 60 days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), Slawson shall submit to EPA a report that documents the date the Project was completed, the results achieved by implementing the Project, including the estimated emissions reductions or other environmental benefits, and the Project Dollars expended by Slawson in implementing the Project.

## VI.    DEADLINE TABLE

| Task | Deadline (On or Before) | Reference Paragraph |
|---|---|---|
| Vapor Control System Field Survey, Engineering Evaluation, and Modification | | 9(a)-(d) |
| Tank System Category A | December 31, 2016 | |
| Tank System Category B | January 31, 2017 | |
| Tank System Category C | February 28, 2017 | |
| Tank System Category D | March 31, 2017 | |
| Submit DI/PM Program | October 31, 2016 | 12 |
| Begin IR Camera Inspections | January 15, 2017 | 12(e)(1) |

| Notify EPA of consultant(s) & work plan | September 30, 2017 | 15(b) |
|---|---|---|
| Complete document review & IR Camera Inspections | June 30, 2018 | 15(f) |
| Submit draft audit report | 90 days after completion of document review & IR Camera Inspections | 15(f) |
| Storage Tank Analog Pressure Monitoring | May 31, 2017 | 16 |
| Electronic Tank Pressure Monitoring | May 31, 2017 | 17 |
| First Semi-Annual Report [January – June] | July 31, 2017 | 31 |
| Semi-Annual Report [July - December] | January 31, 2018 | 31 |
| Semi-Annual Report [January – June] | July 31, 2018 | 31 |
| Semi-Annual Report [July – December] | January 31, 2019 | 31 |
| Semi-Annual Report [January – June] | July 31, 2019 | 31 |
| Semi-Annual Report [July – December] | January 31,  2020 | 31 |
| Semi-Annual Report [January – June] | July 31, 2020 (if necessary, and continuing semi-annually as necessary) | 31 |

## VII.   CIVIL PENALTY

27.    Within 30 days after the Effective Date, Slawson shall pay to the United States

the sum of $2,100,000 as a civil penalty pursuant to Section 113 of the Act, 42 U.S.C. § 7413.  If

any portion of the civil penalty is not paid when due, Slawson shall pay interest on the amount

past due, accruing from the Effective Date through the date of payment at the rate specified in

28 U.S.C. § 1961.

28. <u>Payment Instructions</u>.  Slawson shall pay the civil penalty by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures.  The costs of such EFT shall be Slawson's responsibility.  Payment shall be made in accordance with instructions to be provided to Slawson by the Financial Litigation Unit (FLU) of the U.S. Attorney's Office for the District of North Dakota.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System (CDCS) number that Slawson shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to: Kurt Petersen, Slawson Exploration Company, Inc., 1675 Broadway, Suite 1600, Denver, Colorado 80202, email: epacd@slawsoncompanies.com, on behalf of Slawson.  Slawson may change the individual to receive payment instructions on its behalf by providing written notice of such change in accordance with Section XV (Notices).

29. At the time of payment, Slawson shall send notice that payment has been made: (i) to EPA via email at acctsreceivable.cinwd@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email or regular mail in accordance with Section XV (Notices); and (iii) to EPA in accordance with Section XV (Notices).  Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Slawson Exploration Company, Inc.*, and shall reference the civil action number, CDCS number, and DOJ case number 90-5-2-1-11261.

30. <u>Not Tax Deductible</u>.  Slawson shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating its federal, state, or local income tax.

39

## VIII. PERIODIC REPORTING

31.     After entry of this Consent Decree, Slawson shall submit to the United States in accordance with the requirements of Section XV (Notices), a periodic Semi-Annual Report by the applicable deadline in the Deadline Table for each half of the calendar year (i.e., January through June, and July through December).  Each Semi-Annual Report shall contain the following information:

a.     <u>Modeling Guideline (Paragraph 7)</u>:  A copy of the Modeling Guideline if it was revised during the reporting period.

b.      <u>Engineering Design Standards (Paragraph 8)</u>:  Copies of any Engineering Design Standards completed and implemented during the reporting period that were used at more than one Tank System, unless previously provided.  Slawson shall not be required to submit site-specific Engineering Design Standards, unless requested by EPA.

c.     <u>Vapor Control System Field Survey, Engineering Evaluation, and Modification (Paragraph 9)</u>:  Status and/or completion of Engineering Evaluations and any modifications, including a list of any Tank Systems with associated Production Operations temporarily shut-in pending completion of the Engineering Evaluation and any modifications during the reporting period, a summary of modifications to Vapor Control Systems, and the information specified in subparagraph 9.b(3) for Tank Systems that underwent the subparagraph 9.b evaluation during the reporting period.

d.     <u>Post-Certification of Completion Modifications (Paragraph 11)</u>:  A summary of any evaluations undertaken during that reporting period of whether modifications were necessary at Vapor Control Systems for other Tank Systems and the timing, results, locations, and description of any modifications of other Vapor Control

40

Systems or a timeline for the completion of such modifications.

  e.  <u>Directed Inspection and Preventative Maintenance Program (Paragraph 12)</u>:  Status as to development and implementation of the DI/PM program, and a summary of IR Camera Inspections undertaken pursuant to subparagraph 12.e, including attachment of the information identified in subparagraph 12.e(4).

  f.  <u>Reliable Information, Investigation, and Corrective Action (Paragraph 13)</u>: Copies of the spreadsheets and information as specified and required by subparagraph 13.d.

  g.  <u>Third-Party Verification (Paragraph 15)</u>: Status as to audit, including the results of any VCS Root Cause Analysis required pursuant to subparagraph 15.e.

  h.  <u>Storage Tank Analog Pressure Monitors (Paragraph 16)</u>:  Status and/or completion of installation of pressure monitors, including attachment of the information identified in subparagraph 16.b.

  i.  <u>Electronic Tank Pressure Monitors (Paragraph 17)</u>:  Status and/or completion of installation of digital pressure monitors, including attachment of the information identified in subparagraph 17.c.

  j.  <u>Environmental Mitigation Projects (Section V and Appendix B)</u>:  A summary of activities undertaken, status of Environmental Mitigation Project milestones set forth in Appendix B, and a summary of costs incurred since the previous report.

  k.  A summary of any problems encountered or anticipated, together with implemented or proposed solutions, if available.

  l.  A description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial

steps taken, or to be taken, to prevent or minimize such violation.

32.     If Slawson violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Slawson shall notify the United States in accordance with the requirements of Section XV (Notices) of such violation and its likely duration, in writing, within 10 Business Days of the day Slawson first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Slawson shall so state in the report.  Slawson shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 days of the day Slawson becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Slawson of its obligation to provide the notice required by Section X (Force Majeure). If EPA becomes aware of any violation of any requirement of this Consent Decree, EPA will use best efforts to promptly notify Slawson of such violation.

33.     Whenever any event affecting Slawson's operations or Slawson's performance under this Consent Decree may pose an immediate threat to the public health or welfare or the environment, Slawson shall comply with any applicable federal and state or local laws and, in addition, shall notify EPA as per Section XV (Notices) orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Slawson first knew of the violation or event.  This notice requirement is in addition to the requirement to provide notice of a violation of this Decree set forth in the preceding Paragraph.

34.     Each report submitted by Slawson under this Section, and each Certification of Completion Report submitted pursuant to the requirements of subparagraph 10.c (Vapor Control

System Initial Verification), shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency notifications where compliance would be impractical.

35.     The reporting requirements of this Consent Decree do not relieve Slawson of any reporting obligations required by the Act, or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

36.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Decree and as otherwise permitted by law.

## IX.     STIPULATED PENALTIES

37.     Slawson shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure), or reduced or waived by the United States pursuant to Paragraph 43 of the Decree.  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

a.     Compliance Requirements.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to evaluate the condition of all PRDs/thief hatches, mountings, and gaskets at each Storage Tank as required by Paragraph 9.b and/or take the actions required by Paragraphs 9.b(1) or 9.b(2) (Vapor Control System Field Survey, Engineering Evaluation, and Modification) | $500 per day per Storage Tank for the first 30 days of noncompliance; $2,500 per day per Storage Tank thereafter. |
| Failure to comply with the requirements of Paragraph 9.b(3) (Vapor Control System Field Survey, Engineering Evaluation, and Modification) | $250 per day per violation for the first 30 days of noncompliance; $1,000 per day per violation thereafter. |
| Failure to complete an Engineering Evaluation for a Tank System as required by Paragraph 9.c (Engineering Evaluation) | For each Tank System unless associated Production Operations temporarily shut-in as required by Paragraphs 9.f and 9.g: $1,000 per day per violation for the first 15 days of noncompliance; $2,500 per day per violation from the 16th to 30th days of noncompliance; and $5,000 per day per violation thereafter. |
| Failure to complete modifications for a Vapor Control System as required by Paragraph 9.d (Vapor Control System Modification) | For each Tank System unless associated Production Operations temporarily shut-in as required by Paragraphs 9.f and 9.g: $1,000 per day per violation for the first 15 days of noncompliance; $3,000 per day per violation from the 16th to 30th days of noncompliance; and $9,000 per day per violation thereafter. |
| Failure to conduct an IR Camera Inspection as required by Paragraph 10.a (Vapor Control System Initial Verification) | $500 per day per violation for the first 15 days of noncompliance; $1,000 per day per violation from the 16th to 30th days of noncompliance; and $2,000 per day per violation thereafter. |
| Failure to complete and submit a Certification of Completion Report as required by Paragraph 10.c (Vapor Control System Initial Verification) | $500 per day for the first 15 days of noncompliance; $2,500 per day from the 16th to 30th days of noncompliance; and $5,000 per day thereafter. |
| Failure to implement an approved DI/PM program | $500 per day per Tank System or Well |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| at each Tank System, and associated Well Pad, as required by Paragraph 12 (Directed Inspection and Preventative Maintenance Program) | Pad for the first 30 days of noncompliance; $2,500 per day per Tank System or Well Pad thereafter. |
| Failure to conduct periodic inspections as required by Paragraph 12.e (Periodic IR Camera Inspections) | $500 per day per Tank System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter. |
| Failure to complete all necessary corrective actions as required by Paragraph 12.e(3) (Periodic IR Camera Inspections) | $1,000 per day per violation for the first 30 days of noncompliance; and $2,500 per day per violation thereafter. |
| Failure to maintain records documenting Periodic IR Camera Inspection information as required by Paragraph 12.e(4) (Periodic IR Camera Inspections) | $500 per day for the first 30 days of noncompliance; $2,500 per day thereafter. |
| Failure to complete all necessary corrective actions or temporarily shut-in Production Operations as required by Paragraph 13.a (Reliable Information, Investigation, and Corrective Action) | $5,000 per day per Tank System for the first 15 days of noncompliance; $10,000 per day per Tank System from the 16th to 30th days of noncompliance; and $20,000 per day per Tank System thereafter. |
| Failure to comply with the requirements of Paragraphs 13.b, 13.c, or 13.d (Reliable Information, Investigation, and Corrective Action) | $250 per day per violation for the first 30 days of noncompliance; $1,000 per day per violation thereafter. |
| Failure to comply with the requirements of Paragraph 14.c (Performance Standard) | $5,000 per day per Tank System for the first 15 days of noncompliance; $10,000 per day per Tank System from the 16th to 30th days of noncompliance; and $20,000 per day per Tank System thereafter. |
| Failure to provide notification to EPA of Slawson's recommended consultant and the proposed audit work plan as required by Paragraph 15.b (Third-Party Verification) | $250 per day for the first 30 days of noncompliance; $1,000 per day thereafter. |
| Failure to complete a VCS Root Cause Analysis and/or identify or implement appropriate response actions as required by Paragraph 15.e (Third-Party | $1,000 per day for the first 30 days of noncompliance; and $2,500 per day thereafter. |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Verification) | |
| Failure to equip Storage Tanks with analog pressure monitors in accordance with the requirements of Paragraph 16 (Storage Tank Analog Pressure Monitors) | $500 per day per Tank System for the first 30 days of noncompliance; and $1,000 per day per Tank System thereafter. |
| Failure to comply with the requirements of Paragraph 16.a (Storage Tank Analog Pressure Monitors) | $250 per day per Tank System for the first 15 days of noncompliance; and $500 per day per Tank System thereafter. |
| Failure to comply with the requirements of Paragraph 16.b (Storage Tank Analog Pressure Monitors) | $250 per day per violation for the first 30 days of noncompliance; $1,000 per day per violation thereafter. |
| Failure to equip Storage Tanks with electronic pressure monitors in accordance with the requirements of Paragraph 17 (Electronic Tank Pressure Monitors) | $500 per day per Tank System for the first 30 days of noncompliance; and $1,000 per day per Tank System thereafter. |
| Failure to conduct a site investigation or VCS Root Cause Analysis in accordance with the requirements of Paragraph 17.b (Electronic Tank Pressure Monitors) | $250 per day per Tank System for the first 15 days of noncompliance; and $500 per day per Tank System thereafter. |
| Failure to comply with the requirements of Paragraph 17.c (Electronic Tank Pressure Monitoring) | $250 per day per violation for the first 30 days of noncompliance; $1,000 per day per violation thereafter. |

b.     Environmental Mitigation Projects.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to undertake and complete any of the Environmental Mitigation Projects in compliance with Section V and Appendix B to this Decree | $1,000 per day per violation for the first 30 days of noncompliance; $5,000 per day per violation thereafter. |

c.     Periodic Reports.

| Consent Decree Violation | Stipulated Penalty |
|---|---|

46

| Failure to submit a Semi-Annual Report as required by Paragraph 31 | $1,000 per day for the first 30 days of noncompliance; and $2,500 per day thereafter. |
| --- | --- |

38.    <u>Late Payment of Civil Penalty</u>.  If Slawson fails to pay the civil penalty required to be paid under Section VII (Civil Penalty) when due, Slawson shall pay a stipulated penalty of $10,000 per day for each day that the payment is late to the United States.

39.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

40.    Slawson shall pay stipulated penalties to the United States within 30 days of a written demand by the United States, unless Slawson invokes the dispute resolution procedures under Section XI (Dispute Resolution) within the 30-day period.

41.     Stipulated penalties shall continue to accrue as provided in Paragraph 39, during any Dispute Resolution, but need not be paid until:

a.    If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Slawson shall pay accrued penalties agreed to or determined to be owing, together with interest, to the United States within 30 days of the effective date of the agreement or the receipt of EPA's decision or order;

b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, Slawson shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 days of receiving the Court's decision or order, except as provided in subparagraph c, below; or

c.    If any Party appeals the District Court's decision, Slawson shall pay all

47

accrued penalties determined to be owing, together with interest, within 15 Business

Days of receiving the final appellate court decision.

42.     If Slawson fails to pay stipulated penalties within 30 days after receiving the

United States' written demand, Slawson shall pay interest on unpaid stipulated penalties, as

provided for in 28 U.S.C. § 1961, as follows:  (a) if Slawson has timely invoked dispute

resolution such that the obligation to pay stipulated penalties has been stayed pending the

outcome of dispute resolution, interest accrues from the date stipulated penalties are due pursuant

to Paragraph 41 until the date of payment; and (b) if Slawson does not timely invoke dispute

resolution, interest accrues from Slawson's receipt of the written demand pursuant to Paragraph

40 until the date of payment.  Nothing in this Paragraph limits the United States from seeking

any remedy otherwise provided by law for Slawson's failure to pay any stipulated penalties or

interest.

43.     The United States may, in the unreviewable exercise of its discretion, reduce or

waive stipulated penalties otherwise due it under this Consent Decree.

44.     Obligations Prior to the Effective Date.  Upon the Effective Date, the stipulated

penalty provisions of this Consent Decree shall be retroactively enforceable with regard to any

and all violations of subparagraph 9.c (Engineering Evaluation) and subparagraph 9.d (Vapor

Control System Modification) that have occurred after the date of lodging and prior to the

Effective Date, provided that stipulated penalties that may have accrued after the date of lodging

and prior to the Effective Date may not be collected unless and until this Decree is entered by the

Court.

45.     Slawson shall pay stipulated penalties owing to the United States in the manner

set forth and with the confirmation notices required by Paragraphs 28 (Payment Instructions) and

29, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

46.     Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Slawson's violation of this Decree or applicable law.  Where a violation of this Decree is also a violation of relevant statutory or regulatory requirements, Slawson shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation under the applicable federal or State requirement.

## X.     FORCE MAJEURE

47.     "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of Slawson, of any entity controlled by Slawson, or of Slawson's contractors, that delays or prevents the performance of any obligation under this Decree despite Slawson's best efforts to fulfill the obligation.  The requirement that Slawson exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (i) as it is occurring and (ii) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized to the greatest extent possible.  "Force majeure" does not include Slawson's financial inability to perform any obligation under this Consent Decree.

48.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which Slawson intends or may intend to assert a claim of force majeure, Slawson shall provide notice orally or by electronic transmission to EPA as provided in Section XV (Notices), within 72 hours of when Slawson first knew that the event

49

might cause a delay.  Within seven days thereafter, Slawson shall provide in writing to EPA (i) an explanation and description of the reasons for the delay; (ii) the anticipated duration of the delay; (iii) all actions taken or to be taken to prevent or minimize the delay; (iv) a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; and (v) Slawson's rationale for attributing such delay to a force majeure event if it intends to assert such a claim.  Slawson shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Slawson will be deemed to know of any circumstance of which Slawson, any entity controlled by Slawson, or Slawson's contractors knew or should have known.  Failure to comply with the above requirements regarding an event precludes Slawson from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 47 and whether Slawson has exercised best efforts under Paragraph 47, EPA may, in its unreviewable discretion, excuse in writing Slawson's failure to submit timely notices under this Paragraph.

49.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure does not, of itself, extend the time for performance of any other obligation.  EPA will notify Slawson in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

50.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify Slawson in writing of its decision.

51.     If Slawson elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 30 days after receipt of EPA's notice.  In any such proceeding, Slawson bears the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Slawson complied with the requirements of Paragraphs 47 and 48.  If Slawson carries this burden, the delay at issue will be deemed not to be a violation by Slawson of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.     DISPUTE RESOLUTION

52.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section are the exclusive mechanism to resolve disputes regarding this Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

53.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than 14 days following receipt of such notice.

54.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties.  Such period of

informal negotiations shall not extend beyond 30 days from the date of the first meeting among the Parties' representatives unless they agree in writing to shorten or extend this period.

55.     If the Parties are unable to reach agreement during the informal negotiation period, the United States shall provide Slawson with a written summary of its position regarding the dispute.  The written position provided by EPA shall be considered binding unless, within 45 days thereafter, Slawson seeks judicial resolution of the dispute by filing a petition with this Court.  The United States may respond to the petition within 45 days of filing.

56.     Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set forth in this Section may be shortened upon motion of one of the Parties to the dispute.

57.     This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section or the Parties' inability to reach agreement.

58.     As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  Slawson shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Slawson shall not be precluded from asserting that a force majeure event has caused or may cause delay in complying with the extended or modified schedule.

59.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their initial filings with the Court, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XII.    INFORMATION COLLECTION AND RETENTION

60.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times (subject to any applicable federal health and safety laws and regulations), upon presentation of credentials, to conduct the following:

      a.      Monitor the progress of activities required under this Decree;

      b.      Verify any data or information submitted to the United States in accordance with the terms of this Decree;

      c.      Obtain samples and, upon request, splits or duplicates of any samples taken by Slawson or its representatives, contractors, or consultants related to activities under this Decree;

      d.      Obtain documentary evidence, including photographs and similar data related to activities under this Decree; and

      e.      Assess Slawson's compliance with this Decree.

61.     Upon request, Slawson shall provide EPA or its authorized representatives, splits or duplicates of any samples taken by Slawson at a Tank System or other associated equipment. Upon request, EPA shall provide Slawson splits or duplicates of any samples taken by EPA or its authorized representatives.

62.     Until two years after the termination of this Consent Decree, Slawson shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents,

records, or other information (including documents, records, or other information in electronic

form) (hereinafter referred to as "Records") in its or its contractors' or agents' possession or

control, or that come into its or its contractors' or agents' possession or control, and that directly

relate to Slawson's performance of its obligations under this Decree.  This information-retention

requirement applies regardless of any contrary corporate or institutional policies or procedures.

At any time during this information-retention period, upon request by the United States, Slawson

shall provide copies of any Records required to be maintained under this Paragraph.  This

retention requirement does not apply to voicemail messages or text messages, so long as those

forms of communication are not used for substantive discussions concerning compliance with the

Decree.  Nor does this retention requirement apply to Slawson's outside counsel or consultants

retained specifically for the purposes of potential litigation.

63.    <u>Privileged and Business Confidential Documents.</u>  In response to a request for

Records pursuant to Paragraphs 61 or 62:

a.    Slawson may assert that all or part of a Record is privileged or protected

under federal law.  If Slawson asserts such a privilege, it shall provide the following:  (1)

the title of the Record; (2) the date of the Record; (3) the name and title of each author of

the Record; (4) the name and title of each addressee and recipient; (5) a general

description of the contents of the Record that does not reveal any privileged or protected

information; and (6) the privilege or protection asserted by Slawson.  If a claim of

privilege or protection applies only to a portion of a Record, the Record shall be provided

to the United States in redacted form to mask the privileged or protected portion only.

Slawson shall retain all Records that it claims to be privileged or protected until the

United States has had a reasonable opportunity to dispute the privilege or protection

claim and any such dispute has been resolved in Slawson's favor.

b.       Slawson may also assert business confidentiality claims covering part or all of the Records required to be provided under this Section to the extent permitted by and in accordance with 40 C.F.R. § 2.203(b).  Records determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified Slawson that the Records are not confidential under the standards of 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Slawson.

c.       Slawson may make no claim of privilege or protection (other than claims of Confidential Business Information) regarding any Records that Slawson is required to create or generate pursuant to this Consent Decree.

64.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Slawson to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

### XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

65.     This Consent Decree resolves the civil and administrative claims that the United States may have against Slawson for the following violations at the Tank Systems located on the FBIR listed in Appendix A, including associated Vapor Control Systems, through the date of lodging:

a.       Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R.

55

§ 49.4164(a), to "operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere;"

b.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4164(d), that "[w]ithin ninety (90) days of the first date of production . . . [r]oute all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tanks interconnected with the produced oil storage tanks through a closed vent-system to: . . . (i) [a]n operating system designed to recover and inject the natural gas emissions into a natural gas gathering pipeline system for sale or other beneficial purpose; or (ii) an enclosed combustor or utility flare capable of reducing the mass content of VOC in the natural gas emissions vented to the device by at least 98.0 percent or greater and operated as specified in §§ 49.4165(c) and 49.4166;"

c.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a), that "all openings on each produced oil storage tank and produced water storage tank interconnected with produced oil storage tanks [be equipped] with a cover to ensure that all natural gas emissions are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare;"

d.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(1), that "[e]ach cover and all openings on the cover (e.g., access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank;"

e.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R.

56

§ 49.4165(a)(2), that "[e]ach cover opening shall be secured in a closed, sealed position (e.g., covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except [during those times when it is necessary to use an opening to add or remove material, inspect or sample material, or inspect or repair equipment];"

      f.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(3), that "[e]ach thief hatch cover shall be weighted and properly seated;"

      g.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(4), that "[e]ach PRV shall be set to release at a pressure that will ensure that natural gas emissions are routed through the closed-vent system to the vapor recovery system, the enclosed combustor, or the utility flare under normal operating conditions;"

      h.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(b)(1), that "[e]ach closed-vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by [Section 49.4165(a) the Fort Berthold FIP];"

      i.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(b)(2), that "[a]ll vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment must be maintained and operated properly at all times;"

      j.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(b)(3), that "[e]ach closed-vent system must be designed to operate with no detectable natural gas emissions;"

      k.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R.

57

§ 49.4165(d)(3)(iii), that "[t]he pit flare is operated with no visible smoke emissions;" and

l.       Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4168(b), that true, accurate, and complete annual reports be submitted to EPA containing the information required by the Fort Berthold FIP.

66.     This Consent Decree further resolves the civil and administrative claims that the United States may have against Slawson for the following violations at the Tank Systems located outside the FBIR listed in Appendix A, including associated Vapor Control Systems, through the date of lodging:

a.       Failure to comply with the requirement of the North Dakota SIP, NDAPCR § 33-15-07-02(1), that "[n]o person may cause or permit the emission of organic compounds gases and vapors, except from an emergency vapor blowdown system or emergency relief system, unless these gases and vapors are burned by flares, or an equally effective control device as approved by the department;" and

b.       Failure to comply with the requirement of the North Dakota SIP, NDAPCR § 33-15-07-02(3), that "[e]ach flare required under this section must be equipped and operated with an automatic ignitor or a continuous burning pilot."

67.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraphs 65 and 66.  This Consent Decree does not limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraphs 65 and 66.  The United States further reserves all legal and equitable remedies to address any imminent and

substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Tank Systems and associated Vapor Control Systems, whether related to the violations addressed in this Decree or otherwise.

68.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Tank Systems and associated Vapor Control Systems or Slawson's violations, Slawson shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 65 and 66.

69.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Slawson is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Slawson's compliance with this Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States does not, by its consent to the entry of this Decree, warrant or aver in any manner that Slawson's compliance with any aspect of this Decree will result in compliance with provisions of the Act, the North Dakota SIP, the Fort Berthold FIP, or with any other provisions of federal, State, or local laws, regulations, or permits.

70.     This Consent Decree does not limit or affect the rights of Slawson or of the United States against any third parties, not party to this Decree, nor does it limit the rights of third parties, not party to this Decree, against Slawson, except as otherwise provided by law.

59

71.     This Consent Decree does not create rights in, or grant any cause of action to, any third party not party to this Decree.

## XIV.   COSTS

72.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Slawson.

## XV.   NOTICES

73.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Decree, they shall be made electronically, unless otherwise requested, and addressed as follows:

As to the United States by email:     eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-5-2-1-11261

As to the United States by mail:      EES Case Management Unit
                                      Environment and Natural Resources Division
                                      U.S. Department of Justice
                                      P.O. Box 7611
                                      Washington, D.C.  20044-7611
                                      Re: DJ # 90-5-2-1-11261

As to EPA:                            Director, Air Enforcement Division
                                      Office of Civil Enforcement
                                      USEPA Headquarters, MC 2242A
                                      1200 Pennsylvania Ave., NW
                                      Washington, D.C. 20460

                                      Director, Air & Toxics Technical Enforcement
                                      Office of Enforcement, Compliance &

Environmental Justice
Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO  80202

As to Slawson by mail and email:   Kurt M. Petersen
Vice President of Land and Legal
1675 Broadway, Suite 1600
Denver, Colorado 80202-4675
epacd@slawsoncompanies.com

74.     Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

75.     Notices submitted pursuant to this Section shall be deemed submitted upon electronic transmission or mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   SALES OR TRANSFERS OF OPERATIONS

76.     This Consent Decree does not prohibit the sale or transfer of Slawson's ownership of a working interest in any well, or any well and associated Tank System, provided that Slawson both (a) remains the Operator of the well and associated Tank System and (b) retains the minimum working interest necessary to remain the Operator of the well and associated Tank System. If Slawson proposes to sell an operational interest in, or transfer Operation of, any well associated with a Tank System to a third party unaffiliated with Slawson, Slawson shall advise the third party in writing of the existence of this Consent Decree prior to such sale or transfer and shall send a copy of such written notification to the United States pursuant to Section XV (Notices) at least 60 days before such proposed sale or transfer.

77.     No sale or transfer of an operational interest in, or the operation of, any well associated with a Tank System shall take place before the third party and the United States have

61

executed, and the Court has approved, a modification pursuant to Section XIX (Modification) of this Consent Decree making the third party a party to this Consent Decree and jointly and severally liable with Slawson for all requirements of this Consent Decree that may be applicable to the well and associated Tank System.

78.     This Consent Decree shall not be construed to impede the transfer of an operational interest in, or the Operation of, any well associated with a Tank System to a third party unaffiliated with Slawson so long as the requirements of this Consent Decree are met. This Consent Decree shall not be construed to prohibit a contractual allocation – as between Slawson and a third party – of the burdens of compliance with this Consent Decree provided that Slawson and such third party shall remain jointly and severally liable for the obligations of this Consent Decree applicable to the transferred or purchased Tank Systems and associated well production assets.

79.     If the United States consents, such consent not to be unreasonably delayed or withheld, Plaintiff, Slawson and the third party that has become a party to this Consent Decree pursuant to Paragraph 77 may execute a modification that relieves Slawson of its liability under this Consent Decree for, and makes the third party liable for, all obligations and liabilities applicable to the purchased or transferred Tank Systems and associated well production assets. Notwithstanding the foregoing, however, Slawson may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Tank Systems and associated well production assets, including the obligations set forth in Sections V (Environmental Mitigation Projects) and VII (Civil Penalty). Slawson may propose, and the United States may agree, to restrict the scope of joint and several liability of any purchaser or transferee of any Tank Systems and associated well production assets for any obligations of this

Consent Decree that are not specific to the transferred or purchased Tank Systems and associated well production assets, to the extent that such obligations may be adequately separated in an enforceable manner. The United States shall not unreasonably withhold its agreement.

80.    Effect of Plug and Abandonment.  The permanent plugging and abandonment of a well ("P&A") shall be deemed to satisfy all requirements of this Consent Decree applicable to the well and associated equipment servicing that well.  If the associated equipment is servicing wells that have not been plugged and abandoned, the provisions of this paragraph do not apply. To P&A a well, Slawson must file with the appropriate regulatory agency (i.e., the North Dakota Industrial Commission or the U.S. Bureau of Land Management, or both, as applicable) a Notice of Intent to Plug and Abandon a Well, which includes a downhole schematic setting forth the actions to be taken to cement off the producing formations (the "Downhole Work").  After the Downhole Work has been completed, Slawson will file a Plugging and Abandonment Subsequent Report ("Subsequent Report") confirming that the Downhole Work was completed. After the regulatory agency's receipt of the Subsequent Report, the well will be deemed to have been permanently plugged and abandoned. Slawson shall maintain copies of all documentation required by this Paragraph for inspection and review by EPA.  In each Semi-Annual Report, Slawson shall update Appendix A to reflect any wells and associated Tank Systems that have been permanently plugged and abandoned.  Nothing herein shall preclude Slawson from reusing any equipment from a plugged and abandoned well.

## XVII.  EFFECTIVE DATE

81.    The Effective Date of this Consent Decree is the date upon which the approval of the Decree is recorded on the Court's docket; provided, however, that Slawson hereby agrees that it shall be bound to perform any specific duties scheduled to occur prior to the Effective

Date.  In the event the United States withdraws or withholds consent to this Decree before entry, or the Court declines to enter the Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date terminates.

## XVIII. RETENTION OF JURISDICTION

82.     The Court retains jurisdiction over this case until termination of this Consent Decree pursuant to Section XX (Termination) for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI (Dispute Resolution) and XIX (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XIX.   MODIFICATION

83.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it is effective only upon approval by the Court.

84.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XI (Dispute Resolution).  The Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.   TERMINATION

85.     <u>Termination as to Specific Tank System(s)</u>.  Notwithstanding the provisions of Section XVI (Sales or Transfers of Operations), and independent from the provisions of Section XVI (Sales or Transfers of Operations), Slawson may seek consent to terminate the requirements of this Consent Decree with respect to Tank System(s) (and associated wells and well production

assets that are not also associated with a Tank System that will remain subject to the requirements of the Consent Decree) that have completed all requirements of Paragraphs 9 and 10 (including evaluation of PRDs/thief hatches, Engineering Evaluation, and any necessary modifications) and which are to be transferred entirely from Slawson's operational control.

 a. Such requests for termination shall be provided to the United States in writing and contain the following information:

  (1) the date a Certification of Completion Report was submitted for the Tank System(s); or if such report has not been submitted, Slawson shall submit a Certification of Completion Report for the Tank System(s) in accordance with the requirements in Paragraph 10 (Vapor Control System Initial Verification); and

  (2) whether any Storage Tank in each Tank System has an analog pressure monitor pursuant to the requirements of Paragraph 16 (Storage Tank Analog Pressure Monitors) and/or an electronic pressure monitor pursuant to the requirements of Paragraph 17 (Electronic Tank Pressure Monitors) and if so the monitor(s) shall be moved to a Storage Tank in another Tank System (priority to be given to Tank Systems receiving Produced Oil from higher producing wells), and Slawson will maintain records identifying the Tank System(s) to which the monitor(s) was/were moved.

 b. Until such time as the United States consents to Slawson's request for termination, Slawson's obligations under this Consent Decree shall remain in effect as to such Tank System(s).  Such consent shall not be unreasonably withheld or delayed.

 c. Under no circumstances may Slawson seek termination pursuant to this

Paragraph involving more than 40 Tank Systems subject to this Consent Decree.

> d.      This Section, including the calculation of the 40 Tank Systems, shall operate independently from the provisions in Section XVI (Sales or Transfers of Operations).

86.      After Slawson has: 1) completed the requirements of Paragraphs 9, 10, 11 (as may be applicable up to that time), 15, and installation of the pressure monitors in accordance with Paragraphs 16 and 17; 2) completed Section V (Environmental Mitigation Projects); 3) substantially complied with Paragraphs 11, 12, 13, 14, 16, and 17 for at least two years after completion of the third-party audit in accordance with Paragraph 15; and 4) has paid the civil penalty and any accrued stipulated penalties not waived or reduced by the United States pursuant to Paragraph 43, Slawson may send to the United States a Request for Termination of this Consent Decree, which shall be certified in accordance with Paragraph 34, stating that Slawson has satisfied those requirements, together with all necessary supporting documentation.

87.      Following receipt by the United States of Slawson's Request for Termination of this Consent Decree, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Slawson has satisfactorily complied with the requirements for termination of this Consent Decree, including documentation of compliance with and completion of each requirement.  If the United States agrees that Slawson has complied with the requirements for termination, the Decree may be terminated, and the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

88.      If the United States does not agree that the Consent Decree may be terminated, Slawson may invoke Dispute Resolution under Section XI (Dispute Resolution).  However,

Slawson shall not seek Dispute Resolution of any dispute regarding termination until 60 days

after service of its Request for Termination.

## XXI.   PUBLIC PARTICIPATION

89.     This Consent Decree will be lodged with the Court for a period of not less than 30

days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States

reserves the right to withdraw or withhold its consent if the comments regarding the Decree

disclose facts or considerations indicating that the Decree is inappropriate, improper, or

inadequate.  Slawson consents to entry of this Decree without further notice and agrees not to

withdraw from or oppose entry of this Decree by the Court or to challenge any provision of the

Decree, unless the United States has notified Slawson in writing that it no longer supports entry

of the Decree.

## XXII.  SIGNATORIES/SERVICE

90.     Each undersigned representative of Slawson and the Assistant Attorney General

for the Environment and Natural Resources Division of the Department of Justice certifies that

he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to

execute and legally bind the Party he or she represents to this document.

91.     This Consent Decree may be signed in counterparts, and its validity may not be

challenged on that basis.

92.     Slawson shall identify, on the attached signature page, the name, address, and

telephone number of an agent who is authorized to accept service of process by mail on its behalf

with respect to all matters arising under or relating to this Consent Decree.  Slawson agrees to

accept service in that manner and to waive the formal service requirements set forth in Rule 4 of

the Federal Rules of Civil Procedure and any applicable Local Rules of this Court, including, but

not limited to, service of a summons.  Slawson need not file an answer to the Complaint in this action unless or until the Court expressly declines to enter this Decree.

## XXIII. INTEGRATION/HEADINGS

93.     This Consent Decree and its Appendices constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Decree.

94.     Headings to the Sections and subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXIV. FINAL JUDGMENT

95.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree constitutes a final judgment of the Court as to the United States and Slawson.

## XXV.  APPENDICES

96.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the List of Tank Systems/Well Pads; and

"Appendix B" is Environmental Mitigation Projects.

Dated and entered this 6th day of February, 2016 2017

UNITED STATES DISTRICT JUDGE

68

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. Slawson Exploration Company, Inc.

FOR THE UNITED STATES OF AMERICA:

Date:_____    _____

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Date:_____    _____

MARK C. ELMER
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Denver, CO 80202

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. Slawson Exploration Company, Inc.

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

Date: 11/23/16

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

Date: 11/23/16

SUSAN SHINKMAN
Director, Office of Civil Enforcement
U.S. Environmental Protection Agency

Date: 11/23/2016

PHILLIP A. BROOKS
Director, Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

70

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. Slawson Exploration Company, Inc.

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 8:

Date: 11/22/16

SUZANNE J. BOHAN
Assistant Regional Administrator
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8

Date: 11/14/16

JESSICA PORTMESS
Attorney
Legal Enforcement Program
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. Slawson Exploration Company, Inc.

FOR
SLAWSON EXPLORATION COMPANY, INC:

Date: November 4, 2016

R. Todd Slawson
President
Slawson Exploration Company, Inc.
1675 Broadway, Suite 1600
Denver, Colorado 80202
(303) 592 8880